### FLOWERS et al. v. FLOWERS.

No. 14414—Opinion Filed Dec. 11, 1923.

1. **Parent and Child—Gifts to Child—Fraud and Undue Influence—Presumptions.**

In case of a gift or voluntary conveyance from parent to child, no presumption of fraud or undue influence arises, as between the parties thereto, from the mere fact of the relation. But where a conveyance from a parent to one of several children by way of gift prima facie is not a just or reasonable disposition of the parent's property, and the age and physical condition of the parent, the proportion of the property conveyed to the whole estate, and the circumstances surrounding the gift suggest fraud and undue influence, the transaction should be closely scrutinized, and the burden is upon the donee to overcome the presumption of fact arising from such circumstances.

2. **Appeal and Error—Sufficiency of Evidence—Equity Case.**

In a case of purely equitable cognizance, where the findings and judgment of the trial court are not clearly against the weight of the evidence, the same will not be disturbed on appeal.

(Syllabus by Jarman, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Payne County; C. C. Smith, Judge.

Action by Levy Flowers against Thomas Flowers, Joe S. Flowers, and Scott H. Flowers. Judgment for plaintiff, and defendants bring error. Affirmed.

John P. Hickam and Wilcox & Swank, for plaintiffs in error.

Edwin R. McNeill and Thurman S. Hurst, for defendant in error.

Opinion by JARMAN, C. This action was commenced by Levy Flowers in the district court of Payne county against Thomas Flowers, Joe Flowers, and Scott H. Flowers to cancel a warranty deed and to quiet title to certain real estate. A jury was waived and the cause was tried to the court, resulting in a judgment for the plaintiff, and the defendants bring error.

The plaintiff alleges that in 1890 he homesteaded 160 acres of land, now located in Payne county, and has resided thereon and made the same his home since that time; that on or about April 8, 1921, without any consideration being paid and through undue influence, through fraud, deceit and misrepresentation on the part of Thomas Flowers, one of the defendants, the plaintiff was induced to execute a warranty deed to the defendants to the land in controversy.

For answer, the defendants deny that any fraud or deceit was practiced upon, or any misrepresentations made to the plaintiff to procure said deed, and allege that the plaintiff made, executed, and delivered said deed of his own free will and accord, with full knowledge of his acts and realizing fully the significance thereof.

The defendants, for a reversal of this cause, rely upon and present two assignments of error—that the findings and judgment of the trial court are not supported by the evidence, and that said findings and judgment are contrary to the law. Both assignments are presented together.

The record discloses that in 1890, the plaintiff selected this land as his homestead, and that he, with his children, his wife having died in 1885, established his home there. The plaintiff is the father of 13 children, five of whom are living, including the three defendants, his sons, and Emma Jane Hawkins and Aggie Boulton, married daughters. Several of the plaintiff's children were buried on this homestead. After the children had grown up and moved away to establish homes of their own, Aggie Boulton, with her husband, remained at home to look after her father and to assist in taking care of the place, and remained there for a number of years, when through

some dissatisfaction that had taken place among some members of the family, the record not being explicit on this point, the daughter and her husband moved from the place. The premises were then rented to outside parties for two years and the plaintiff again took charge, and realizing his inability to look after the affairs by reason of his advanced age and enfeebled condition, made arrangements with his son, Thomas, one of the defendants, to bring his family and live there with him—this being done for two reasons according to the testimony of the plaintiff—to help Tom, who needed help, and, at the same time, feeling that Tom would be of assistance to the plaintiff.

At this time, the plaintiff was 93 years of age; he had led the active life of a pioneer, and although vigorous for his years, old age had begun to make inroads, and now he was forced to lean and depend upon his trusted son, Thomas, who had assumed control of affairs. The record discloses that the plaintiff had implicit confidence in Thomas and relied upon his representations and judgment. On or about April 4, 1921, representatives of certain oil interests called on the plaintiff for the purpose of procuring an oil and gas lease on this homestead, but before the plaintiff would make a lease on said premises, and before he made up his mind as to what was the proper thing to do in connection therewith, he called for Thomas, who advised that the said lease be executed for the consideration offered, $2,400, and thereupon the plaintiff executed said oil and gas lease and the consideration was to be paid on April 8th at the Stillwater National Bank at Stillwater, Okla. On the morning of April 8th, Thomas made arrangements with a neighbor, Leonard Witt, to take the plaintiff and himself to Stillwater in an automobile; Mr. Witt, with his wife, drove by for the plaintiff and Thomas, who got in the back seat and upon arriving at Stillwater, the car was stopped at the Stillwater National Bank, under the directions of the plaintiff, and Thomas directed Mr. Witt, who was driving the car, to come back to the bank as soon as he had gone on an errand for himself. Upon going into the bank, the plaintiff was advised that the $2,400 for the oil and gas lease was ready to be paid to him and the plaintiff then directed one of the officers of the bank to divide this money equally among his three sons, the defendants and himself, giving to each $600. The record discloses that a good while prior to this time the plaintiff had made a will bequeathing to the defendants the homestead and to his daughters certain other property consisting

of money which was deposited in a local bank at Stillwater. The will was deposited in the Stillwater National Bank for safe keeping. When the $2,400 was divided, the plaintiff called for the will, which was handed to him by an employe of the bank, and the plaintiff placed it in his pocket, and he testifies that he never saw it again but that Thomas told him that he, Thomas, had burned it. On this same day the plaintiff withdrew from the bank the money on deposit, specified in the will for the girls, and the plaintiff testifies that it was his intention that all of the children should inherit equally the land in question. Before this transaction was completed, Mr. Witt had returned to the bank, and testifies that the first thing he observed, when he went into the bank, was that the plaintiff was standing with a government deed or patent in his hand, from which a person, operating a typewriter, was taking the description of land and inserting it in an instrument which he soon learned was a deed. This witness further testifies that during the preparation of this deed, he heard the plaintiff say that he wanted the $2,400 consideration for the lease divided among his sons and himself, and that nothing was said by the plaintiff at that time about making or executing a deed, and that nothing was said by any other party, calling attention to the fact that a deed was being prepared. The record discloses that the plaintiff, at this time, was practically blind and could neither read nor write, and had not been able to read for about ten years. That the plaintiff signed this deed by mark, which was witnessed by his neighbor, Mr. Witt, and another person, Mr. Witt testifies that when the plaintiff made his mark to said instrument and when the same was being signed and executed, nothing was said as to the character and contents of the instrument. The evidence shows that the manner of executing this deed was suspicious and unusual and it so addressed itself to Mr. Witt, for he testifies that while the parties were still in the bank, in discussing the matter of the executing of this deed by the plaintiff, the witness Witt asked Thomas, "How come him to do that?" and Thomas said, "I don't know." Said witness testified that no further answer or explanation was given by Thomas. The plaintiff did not have the advantage of the advice of a third and disinterested party. The plaintiff testifies that he did not know that he was executing the deed on this occasion, and that the only thing that he was conscious of doing was the dividing of this $2,400 among his three sons and himself, and that he did not know that a deed had been executed to this land

until sometime thereafter when his son, Scott, came up to get his part of the lease money, and told him that this deed had been executed. The record discloses that the plaintiff, perhaps, did not then fully realize that said deed was in fact executed and did not then understand the full import thereof, but that in a short time thereafter, when the relationship between the plaintiff and Thomas had become somewhat estranged, the plaintiff was made to fully realize that a deed had been executed and what it meant to him, when Thomas made the remark to the plaintiff that he could have gotten the whole thing, meaning the deed to the entire tract, if he had not acted a fool and put the other boys in. In answer to a question as to what he said in response to this statement made by Thomas, the plaintiff answered, "I had to stop and study." The love and affection of Thomas for his father grew colder each day and the breach began to widen between them, and the plaintiff testifies that one day while on his way down to his neighbor's house to have them write a letter to his other sons, telling them how Tom was treating him and asking that they come and live with him, that he grew tired and weary and had to sit down by the roadside to rest and Thomas came up and when he learned that the plaintiff was going to Mr. Witt's house, Thomas grew angry and choked his father and tried to force him to go back home, but the plaintiff refused to do so and crawled to his feet and again started on his way to Mr. Witt's, and Thomas overtook him and demanded and insisted that he go back home and threatened if he did not go back that he, Thomas, would throw everything he had out doors, and the testimony further shows that Thomas, after this deed was executed, threatened to sell everything on the place, and when these conditions arose, the plaintiff went to make his home with his daughter, Aggie Boulton.

This suit was filed on October 17, 1921, just a few months after the deed in question was executed. The plaintiff appeared, personally, at the trial of this cause and testified in support of the allegations of said petition.

The defendants, in their testimony, deny that the plaintiff was overreached or imposed upon and contend that the plaintiff executed this deed freely and with the full understanding of what he was doing, and knew the consequences of his acts; and introduced witnesses who testified that, in their opinion, the plaintiff was able to transact his business and knew what he was doing. Employes of the bank who assisted in preparing this deed testified that the deed was prepared at the request of the plaintiff and that the plaintiff understood what he was doing. The record is clear that these employes of the bank were acting in good faith; but the outstanding facts in this case are that this was all the land the plaintiff owned, that he was of the unusual and extraordinary age of 93 years, almost a century old, and was practically blind and could neither read nor write; that no consideration was paid, and at the time, when he was giving away practically all of his property by making this deed, he did not have the advice of a disinterested third person, which he was entitled to and should have had, under such circumstances, to advise him fully of the consequences of his act and to let him understand that he was parting with his home irrevocably (12 R. C. L. 929; 28 C. J. 654; Post v. Haggan (N. J.) 65 Atl. 1026; Noble v. Hulton (Kan.) 92 Pac. 289), and the further fact that there is nothing to show why the plaintiff should deprive his two daughters of their interest in this land. Under these circumstances, all the witnesses in the world would never make a court of equity believe that the plaintiff understood, when he signed the deed in question, that he was forever parting with his home, and making it possible for him to be kicked out and be placed in a position where he could say that "he hath not a place to lay his head." The circumstances force the conclusion that the plaintiff was unduly influenced by some means to do this strange and unusual thing.

In rendering judgment for the plaintiff, the trial court accepted and believed the theory of the plaintiff and, under the record, we cannot say that the findings and judgment of the trial court are against the weight of the evidence. Figuratively speaking, the evidence shows that the plaintiff was required to tie the noose about his own neck when he was caused to stand and hold the government patent, from which the writer of the deed copied the description of the land, which the plaintiff was giving away.

Where a parent makes a gift or a voluntary conveyance to a child, the rule is that no presumption of fraud or undue influence arises by reason of this relationship; but the further rule is established, and it is the one that governs this case, that where a conveyance from a parent to one of several children by way of gift is not a just and reasonable disposition of the parent's property, and the age and physical condition of the parent, the proportion of the property conveyed to the whole estate, and the circumstances surrounding the gift, suggest fraud and undue influence, the trans-

action should be closely scrutinized, and the burden is upon the donee to overcome the presumption of fact arising from such circumstances. Gibson v. Hammang (Neb.) 88 N. W. 500; 28 C. J. 670; Smith v. Smith (Wis.) 19 N. W. 47.

The Supreme Court of Oklahoma in the case of Daniel v. Tolon, 53 Okla. 666, at page 672, 157 Pac. 756, in discussing this question lays down the following rule, to wit:

"While equity does not deny the possibility of valid transactions between parties, where a fiduciary relationship exists, yet because every such relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively his compliance with equitable requisites, and of thereby overcoming the presumption."

The defendants have failed to overcome the presumption of undue influence brought to bear in connection with the execution of the deed in question, and the record fully supports the findings and judgment of the trial court, and the same is, therefore, affirmed.

By the Court: It is so ordered.