## CANFIELD v. CANFIELD et al.

No. 23266. Jan. 30, 1934.

Rehearing Denied April 3, 1934.

A. W. Billings, Thos. W. Caffey, Clyde J. Watts. and Stokes, Jarman & Brown, for plaintiff in error.

Rittenhouse, Webster & Rittenhouse, for defendants in error.

OSBORN, J. This appeal involves two actions, one to set aside a will and the other to cancel a warranty deed. Both were commenced in the district court of Woodward county by Lester Canfield, Myrtle Canfield Brandt, C. V. Canfield, Bess Canfield, Ida May Canfield Van Dall and Marguerite Canfield Brucher, against Laura Canfield. The defendant is the wife of C. N. Canfield, who died testate in Woodward county May 14, 1929. The plaintiffs are the children of C. N. Canfield by two former marriages. A petition for the probate of the will of the deceased was filed in the county court of Woodward county by Laura Canfield and

a contest thereof was filed by the plaintiffs in which it was alleged that the will was invalid on account of undue influence, fraud, menace, and duress exercised by Laura Canfield upon the deceased and that deceased was mentally incompetent to make a will on April 17, 1928, the date of the execution thereof. A hearing was had in the county court, and the evidence analyzed by the court and found to be wholly insufficient to sustain the contentions of the contestants, and it was ordered that the will be admitted to probate. From said order, plaintiffs appealed to the district court.

On June 4, 1929, plaintiffs filed an action in the district court to cancel a certain warranty deed from Lydia Canfield to Laura Canfield to 160 acres of land in Woodward county. It was alleged that Lydia Canfield was a trustee for C. N. Canfield, the deceased, of said land, and the deed was executed under the direction of C. N. Canfield, and the validity of this transaction was attacked on the same grounds as alleged in the action to contest the will, that is, mental incompetency, fraud, duress, and undue influence. The two actions were consolidated in the district court and tried as one action. A great array of evidence was introduced, the record containing more than 2,000 pages, and at the conclusion thereof the trial court found in favor of the plaintiffs on the issue of undue influence and denied probate to the will and canceled the warranty deed. From said judgment, the defendant has appealed. The parties will be referred to as they appeared in the trial court.

The will in question devised to Laura Canfield all personal property and a life estate in 160 acres of land in Woodward county, with the remainder to the heirs of testator to be divided by them by agreement or by law. Laura Canfield was appointed executrix without bond. It is admitted that testator owned 320 acres of land in Missouri, which is not mentioned in the will and which descends to his heirs under the law of descent and distribution.

Since the issue involved in this appeal is somewhat unusual, we deem it advisable to set out in detail various excerpts from the findings of the trial court which are as follows:

"As I understand, there are three grounds of protest in this case, one of them being paranoia. That is, the testator at the time of making the will was laboring under delusions and suffering of what medical men call the disease of paranoia. The second ground is that he was a morphine addict and thereby mentally incapable of executing a will. The third ground is that he was under the undue influence of Laura Canfield at the time of the execution of the will. * * *

"His first wife died. Two children were born of that first marriage. Myrtle Brandt and Lester Canfield. Subsequently he married Belle Canfield. I think that the marriage occurred in Kansas and of that marriage four children were born. They were subsequently divorced. I have forgotten the year of that divorce, but in June, 1920, he was married to Laura Button, now Laura Canfield—it was in 1919. * * *

"But now, gentlemen, when he moved to Woodward county, and I believe the testimony will show, he moved here in 1906, he possessed those characteristics that were peculiar—he was temperamental, stingy, frugal, a man of strong passions, capable of intense hate, and I am making those characteristics of his as are justified by the evidence here, and at the time he met Mrs. Laura Canfield he had arrived at the age when he was breaking down—he was then 69 years old. He lived out on a farm southeast of Woodward—batched there. I believe the testimony shows that during those days that Myrtle, his oldest daughter, and Lester, his oldest son, had come down into this country and lived near there; that they gave him some assistance. Mrs. Brandt would clean up his house and look after his clothes, and sometimes Lester would help with some of the farm work. But those were his characteristics, that the environment under which he lived at the time he got in touch with Laura Button. * * *

"Gentlemen, the pivot in this case, as I view it, was that of marriage, and what I mean to say now about that is that if I had not come to the conclusion that the marriage on her part was mercenary and purely so—if I had not come to that conclusion, the evidence would of necessity cause me to have a different conclusion.

"I think the circumstances would lead an unbiased mind to an irresistible conclusion that a marriage upon her part was purely mercenary. Now, I will tell you why I think that. The evidence here does not show that she made any study whatever of this man's characteristics—the traits of character of Mr. Canfield. I say it does not show it. In fact, when the Littrells invited her to stay with the object in view of studying him, she stated she had just as well marry now and not wait. There was nothing about Mr. Canfield in those days to make any woman in the world have affection for him. Nothing in the world. The characteristics here shown were such as would drive any woman away from him. He cared nothing for dress, society, lived in

isolation, was high tempered, cruel, frugal, stingy, suspicious, lived the life of a hermit, was 69 years of age and had gone through two marriage experiences, had hatred in his heart and carried it around with him, and was then 69 years old and breaking in health. So I am saying now that, right on the start, right in the beginning, I can reach no other conclusion in this case—there could be no justification for any other conclusion. * * *

"As I say, concluding that Mrs. Canfield did have the plan in mind to get the property, about 1920 she got the property in Oklahoma county, and in 1924 they went together and he had his deed made from Lydia Canfield to her. Now, here is another thing we see in the case. This sense of domination—this idea of a dominating will that he showed in Kansas—if that fellow had the kind that some of the witnesses portray here—if a train was in his way when he was walking home with a sack of flour on his back, he would expect the train to get off the track. He had that determination of having his own way. But, gentlemen, after he married Laura Canfield, that thing became submissive, so far as the evidence is concerned. Outside of two or three minor instances after he married Laura, we do not see him exercising that personal desire, force or anger that he did before.

"Now, he never owned a car before he was married. Did not know how to drive one, and subsequent to the marriage, whenever you saw C. N. Canfield, you saw her. They were inseparable companions. She was with him constantly. **I think it is true that she was courteous and kind to him—absolutely, I believe that is so.** But if she had the idea of getting the property, I cannot reach any conclusion about it—the usual course of exerting undue influence was through the very thing that she exercised over C. N. Canfield. **She was kind to him and waited on him. Probably for the first time in this life, so far as I know, and through that kindness and sympathy and care she gave him, his domination ceased, I believe. He felt that kindness—was not used to it and through that his domination ceased and hers became paramount and dominant. That is my personal conclusion that she used kindness to pursue and secure the ends of that marriage.** She got the land from Lydia in 1924. It is true that he instructed Lydia to make the deed to Laura, that is true, but it is going a long way to say we must find immediate acts of undue influence as would destroy his freedom of action. Later the will was made in 1928, I believe it was. He was then suffering from cancer. Quite a few have testified that Laura was quite anxious to get that thing settled. She had expressed to, I think, two witnesses and maybe three, **that unless a will was made, these heirs would put her out in the road penniless.** There is no question, gentlemen, that

under those conditions she persistently insisted upon provision being made to protect her from these heirs. Now, they got Jennings to draft this will. The question was discussed there before the will was drawn about these heirs breaking the will, and I am not sure, but I think Mr. Jennings suggested that in the will, instead of leaving one dollar, that if they left the remainder in fee subject to the life estate of Laura Canfield, that that would prevent the heirs from breaking the will, and my judgment is that is the reason this provision is in the will, not because he cared anything about these children that it was put in, but to prevent them breaking the will, and for that reason only.

"My conclusion, gentlemen, is—I notice in the suit relative to the deed here that the defendant does not plead that it was a gift and no plea of the statute of limitations was made—my conclusion is, gentlemen, first, that there was no such morphine habit upon the part of Mr. Canfield as would destroy his ability to understand the nature and consequence of the transaction of the will. Second, I think the evidence on the ground of paranoia is insufficient to warrant the court to grant the relief prayed for in the petition. Third, I find that Laura Canfield exerted undue influence over the mind of C. N. Canfield and that the same was of such extent and character as to justify the court in setting aside the deed from Lydia Canfield to Laura Canfield, and the court, and the court finds that Lydia Canfield holds said land in trust for the estate of C. N. Canfield, deceased, and the will denied probate. * * *"

We do not deem it improper to call attention to cause No. 21708, Canfield v. Canfield, 167 Okla. 595, 31 P. (2d) 149, decided this date by this court which involves the same issues of law and fact as are involved herein. It was sought therein to obtain cancellation of certain deeds to land in Oklahoma county, and the action was tried in the district court of Oklahoma county. The issues of mental incompetency and undue influence were raised therein. Both cases were very carefully tried. From the appearance of the record, all the testimony available was submitted to assist the trial court in that case and in the instant case to arrive at a proper conclusion. In cause No. 21708, the trial court found against the plaintiffs in error (defendants herein), and we have held that said findings are not against the clear weight of the evidence. In the instant case, the trial court found against the plaintiffs on the issue of mental incompetency, but found in favor of the plaintiffs on the issue of undue influence. The principal contention of the defendant is that the influence of a wife through kind-

ness, causing a husband to execute a will and deed in her favor, is not undue influence.

We have carefully studied the facts found by the trial court, and find that the judgment. denying probate to the will and canceling the deed on account of undue influence is based upon the following findings: First, that the marriage was purely mercenary; that defendant had no affection for the testator by reason of his peculiarities, personality, and advanced age. We cannot say whether or not this marriage was prompted by love or by mercenary motives, or whether after marriage a relationship of genuine affection developed between the parties, but we say that such is not the determinative issue. It is of little benefit in passing upon the validity of a will to examine into the love and affection held by the beneficiary towards the testator. We would be more concerned in inquiring into the affection held by the testator for the beneficiary, for this would throw some light upon the intention of the testator, as it is but natural that the object of his affection would likewise be the object of his bounty. In this connection the record shows that the parties lived together for ten years. So far as the record shows, they were companionable, contented, and happy. It is true that testator for several years was in failing health and was finally stricken by cancer. It is argued with considerable force that the record shows that during his illness defendant waited on him, looked after him, and ministered to him with all the care and tenderness that a spouse is expected to show under such circumstances. At least, it is not shown that defendant failed to exercise toward testator any wifely duty whether in sickness or in health. With these facts in mind, together with the fact that prior to their marriage and since 1910 testator had lived practically alone, without companionship, except occasional intervals when he was visited by his children, it is not unreasonable to assume that testator maintained a warm affection for the one who had been his companion and who ministered to him in the closing years of his life.

A further examination of the findings of the trial court leads us to believe that the finding of the trial court of undue influence is based largely on evidence that the defendant was kind to the testator and considerate of his wants and needs, and thereby secured the influence over him which the court has found to be undue influence. The authorities are ample to sustain the contention of defendant herein that such influence is not undue influence such as to invalidate a will made in favor of the one who has been kind and ministered to a testator. This is especially true where the relationship of husband and wife exists and each of the parties has taken a solemn vow "to keep the other in sickness and health, for better or worse till death do us part."

The general rule relating to undue influence, as expressed in Re Riddle's Estate, 165 Okla. 248, 25 P. (2d) 763, is as follows:

"Suspicion, conjecture, possibility, or guess that undue influence or fraud has induced a will, is not alone sufficient to defeat the probate of a will.

"Power, motive, and opportunity to exercise undue influence do not alone authorize the inference that such influence has in fact been exercised.

"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time the instrument is made and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced in the ordinary affairs of life or that he was surrounded by relatives and friends in confidential relationship with him at the time of its execution."

See, also, Myers v. Myers, 130 Okla. 184, 266 P. 452; McClure v. Kerchmer, 107 Okla. 28, 229 P. 589; Kindt v. Parmenter, 83 Okla. 116, 200 P. 706; Gleason v. Jones, 79 Okla. 191, 192 P. 203.

This court has not heretofore dealt with a problem exactly similar to the one presented here, but we find the following pronouncements of law from the various jurisdictions to be applicable hereto:

"Influence secured through acts of kindness is not wrongful, and therefore not undue." Chrisman v. Quick (Ky.) 193 S. W. 13.

"The influence of a wife is not undue. The fact that a man bequeathes his estate to his wife, excluding his children, his father or other relations, is absolutely immaterial upon the question of undue influence. The silent influence of affection and respect, augmented by the tender and kindly attentions of a faithful spouse, cannot be regarded as in any sense undue. Nor will the fact that the wife, by solicitation, or even by urgent importunity, procures for herself all her husband's property, or a larger share than he devises to others, raise a presumption of law that the husband's will was procured by undue influence exerted by her, or that his mind did not act freely in preparing it." Underhill on Wills, p. 211.

"If a wife by her industry and virtue, and by the assistance which she has rendered her husband, has gained such an ascendancy

over the mind of her husband; if she has by her faithfulness and good qualities secured his respect and esteem, so that her wish is a law to him, such influence, though it result in procuring a will in her favor to the total exclusion of all the relatives of the husband, would not amount to undue influence." Underhill on Wills, p. 211.

"Undue influence is such as destroys testator's free agency, constraining him to do against his will what he would otherwise refuse to do, whenever exerted, if operating on testator's mind at time he executes paper, but any reasonable influence by acts of kindness or appeals to feelings or understanding, not destroying free agency, is not undue influence." Seals v. Seals (Ky.) 281 S. W. 982.

"Kindness and consideration shown testatrix by husband and beneficiary cannot be considered as undue influence impeaching testatrix's will.

"Prejudice or aversion of testatrix for some of natural objects of bounty does not constitute undue influence, though will is clearly fruit of resentment or dislike." In re Carson's Estate (Cal. App.) 239 P. 364.

"There is an influence which a wife, by her virtues, her love, and her sacrifices, gains over her husband's affections and conduct, whereby she may be caused to make a will in her favor, which cannot be considered as and must not be taken for undue influence." Craycroft v. Crawford (Tex. Civ. App.) 275 S. W. 124.

"Influence over testator gained by affection and friendly attention is not 'undue influence' which will invalidate a will." Biggerstaff v. Wicks (Ill.) 180 N. E. 840.

"The word 'undue' when used to qualify 'influence,' has the legal meaning of 'wrongful,' so that 'undue influence' means a wrongful influence, but influence acquired through affection is not wrongful." Hurd v. Reed (Ill.) 102 N. E. 1048.

"After having twice read the entire evidence, we have been unable to discover anything more than the ministrations of kindness on the part of the defendants toward an old friend which induced him to make them the recipients of his bounty. Influence which is gained alone through kindness, and springs from the fondness of affection, is not of that character which the law condemns as undue and because of which a last will and testament may be set aside." Luebbert v. Brockmeyer (Mo. App.) 138 S. W. 92; Campbell v. Carlisle, 162 Mo. 634, 63 S. W. 701; In the matter of Gleespin's Will. 26 N. J. Eq. 523; Mackall v. Mackall, 135 U. S. 167, 10 Sup. Ct. 705, 34 L. Ed. 84.

"The fact that the beneficiaries of a will had by kind offices and congenial intercourse acquired considerable influence over the testatrix, and that they had requested or 'teased' the testatrix to make provisions in her will in their favor, are not sufficient to establish undue influence. Such provisions are not unlawful." McCullouch v. Campbell (Ark.) 5 S. W. 590.

"A testator's favor expressed in a will may be won by devoted attachment, self-sacrificing kindness, and the beneficent ministrations of friendship and love. These influences are not undue. We expect partiality to attend them. They bring preferment as their natural reward, and they do not become unrighteous, although they establish a general ascendancy over the testator leading him to find comfort and pleasure in gratifying the wishes and desires of the person exercising them. * * * It is not improper to advise, to persuade, to solicit, to importune, to entreat, and to implore. Hopes and fears and even prejudices may be moved. Appeals may be made to vanity and to pride; to the sense of justice and to the obligations of duty; to ties of friendship, of affection, and of kindred; to the sentiment of gratitude; to pity for distress and destitution." Ginter v. Ginter (Kan.) 101 P. 634.

It is not the province of the courts to unravel all of the intricacies of human relationship. The writer of this opinion, in the course of an active career in the law, has witnessed the base and sordid motives governing human activities and has seen the restraining hand of the law stretched forth to prevent the triumph of fraud and treachery and duplicity and unfair dealing. I have seen genuine love and affection repaid by its beneficiaries with insults and perfidy and ingratitude. I have seen the priceless flower of love withered by the infamy of a faithless and undeserving recipient, and I have witnessed the tragic heartaches of those whose trust and confidence have been betrayed and sacrificed upon the altar of greed and avarice and selfishness. Such a picture is common in the courts.

But there are other pictures that have been cast upon the screen of life in our courthouses. Rare they are, indeed, but they stand out in memory as a blazing star in the Stygian darkness of the night. I have seen the "affection that hopes and endures and is patient"; I have seen "the beauty and strength of woman's devotion"; I have seen exemplified in life that fidelity and loyalty so sincerely expressed by the Moabite woman of old, "Whither thou goest, I will go, whither thou lodgest, I will lodge, thy people shall be my people and thy God, my God."

And as I delve into the record in this case, I can see the faint outlines of the two pictures above painted. It is not my purpose to criticize or to praise. But in this record

is disclosed one of life's regrettable melodramas. A strong-willed man marries three times; he has children by his first wife and she dies; he marries a second time and brings children into the world and the marriage is torn asunder. The wife retains the children, and this strong-willed man migrates to a new country to lead a life of loneliness. No doubt he is embittered, and no doubt his relationship is strained, not only with his former wife, but with the children left in her care. The years roll on and his children leave him largely to his loneliness. Strong-willed, determinative, embittered, perhaps, 69 years of age, with the shadows of life lengthening toward the East, a woman, perhaps lonely, perhaps homeless, perhaps companionless, perhaps mercenary, is invited by marriage to share with him his despondent loneliness. For ten years she lives with him and endures his fitful temper, his dominating will; and all of the energy of able counsel, aided by insistent heirs, could find no action of hers which in the opinion of the trial court authorized a finding by him that she had treated him otherwise than with courtesy and sympathy and care. The trial court found that through these gentle ministrations the savage breast had been soothed and his domineering disposition abated.

We cannot give our assent to the reasoning of the trial court. It was but natural that, nourished by such kindly emotions, she should be the object of his bounty rather than the children whose relationship with him was strained and who had manifested no interest in him and his affairs, with slight exception, until the title to his property, by operation of law, was changed by his death. Within fifteen days they had searched out the evidence and filed a suit to cancel a deed which had been executed at his direction many months before his death. They had searched out the witnesses to show that their father was insane and that he was dominated by a woman who was kind and courteous and sympathetic to him in his old age and in his sickness.

The law does not permit a dominant will to substitute itself for the will of another. But the law looks with disfavor upon a claim that a wife, showing affection and sympathy, who has remained faithful unto the end, should not be the beneficiary of the worldly goods of him unto whom she has ministered. The courts will not seize upon kindness, sympathy, and manifested affection to deprive a faithful spouse of that which has been bestowed upon her by one whose life has been sweetened by the perfume of such wifely fidelity.

In this case, it is true the wife, by deed, received a large portion of the estate of her deceased husband. She was given only a life estate by will in 160 acres of his land and the remainder went to his heirs. In addition, 320 acres of land in Missouri were disposed of by will, in which tract she would take her interest as an heir. There is nothing disclosed under the circumstances in this case which shows an undue domination of the will of her deceased husband.

The judgment of the trial court is reversed and the cause remanded, with directions to admit the will to probate and to quiet the title of defendant, Laura Canfield, in the tract of land in controversy.

RILEY, C. J., CULLISON, V. C. J., and BUSBY and WELCH, JJ., concur.