684

MONTGOMERY v. WILLBANKS et al.

No. 32233. Feb. 18, 1947.

Rehearing Denied May 13, 1947.

Second Petition for Rehearing Denied

June 17, 1947.

*181 P. 2d 240.*

Wm. T. Powell, of Walters, and John P. Marrs, of Wichita Falls, Tex., for plaintiff in error.

Walter Hubbell, of Walters, Arch Dawson, of Wichita Falls, Tex., and Wm. Chester Bowen, of Nashville, Tenn., for defendants in error.

BAYLESS, J. Baldwin Montgomery appeals from a judgment of the district court of Cotton county, rendered in an action tried without a jury, in favor of Ida D. Willbanks et al., heirs of Addie Dollar Bell, deceased, canceling a deed made by Bell to Montgomery.

The deed was executed March 15, 1940, caused to be recorded by Bell August 29, 1942, and conveyed the land, subject to a reserved life estate, for an expressed consideration of "love and affection." It is not contended that any valuable consideration passed between grantor and grantee at the time the deed was executed.

Following the death of Bell March 21, 1943, her heirs instituted and prosecuted this action on the theory the deed was void because it was given by a person of weak mind to another who occupied a fiduciary relationship to the grantor, for no valuable consideration, under such circumstances as cause courts to scrutinize such transactions closely and require the grantees to assume the burden of dispelling the presumptions of fraud, undue influence, and oppression.

This summarized history of the parties will display the controversy. Bell was a poorly educated woman, who lived on a farm most of her life, and it was controverted whether she was of more or less than average intelligence. When her husband died she moved to Wichita Falls, Tex., where she lived the remainder of her life. She met Montgomery there when she moved into his mother's home. A short time later she moved into an apartment and later bought a home, in which she lived for the remainder of her life. When she met Montgomery she was 58 years of age and he was 39. The evidence shows a complete contrast between them. He was unmarried, had some education, was interested in musical and cultural and religious matters, and was very active in the business and social life of the town. He dealt in insurance and real estate. Bell was greatly attracted to him immediately, and soon delegated to him the entire and unreserved control and management of her business. The two had mutual

friends, he and his brother daily took the noon meal in Bell's home, and in addition to looking after her business affairs, he spent a great deal of time and attention towards making her life comfortable and pleasant. The heirs' evidence tends to prove that Bell was "man crazy" and desired to marry Montgomery, while all of the evidence negatives the idea that he ever entertained such a notion. All of his witnesses denied observing any matrimonial notions on the part of Bell. He treated her with every kindness, and there is no hint in the evidence of an immoral relationship. The evidence shows that from 1934 on she told various people Montgomery was to have all of her property when she died, she referred to him as "son," that their attitude toward each other was such that one witness, unacquainted with their true status, inferred he was her son until enlightened. In addition to this deed she left a will naming him sole beneficiary. This will was yet in litigation in Texas when this action was tried and we refer to it only as a part of the history of Bell's life and, although it was introduced in evidence here, yet it has no legal effect on the issues eventually to be determined.

Bell's heirs are her sisters and brothers of the whole and half blood, and the children of those deceased. The sisters and brothers lived in other states, were of a migrant, tenant farmer class, and, while their feeling for each other was fraternal, there were visits and letters between them only at long intervals.

At the close of plaintiffs' evidence defendant moved for judgment on the ground the evidence was insufficient to sustain a judgment in favor of plaintiffs. The trial court overruled this motion with apparent reluctance, saying:

". . . I am not entirely satisfied at this time as to the legal effect of this testimony, but inasmuch as if your position is correct, the court can take care of it and will in the final judgment. I am not saying you are correct. . . . I am saying if it is, you can't be injured in the matter. I will overrule you at this time. I want to hear the whole testimony."

Plaintiffs failed to show Bell was insane, the medical expert they called as a witness defining her willingness to marry Montgomery as a delusion but refusing to pass on her sanity on the basis of the hypothetical question asked. Her personal physician described her mental and physical condition as that of the average person her age and stated positively she was not insane or of unsound mind. She was not shown to be physically impaired, being as able to go about, to care for her home, do her cooking and care for herself as any person her age until the last few months of her life. It is clear that her limited education and business experience caused her to entrust her affairs to Montgomery, but whether she interfered with his management and if so to what extent is not shown, but at the same time it appears she was conversant with his action. Both could draw checks on her account. It is not shown that he excluded her from knowledge of her affairs or in any manner oppressed or deceived her. The weight of the evidence is insufficient to show that Bell's mentality was impaired. The trial court did not find she was of unsound mind, but rather that she was able to transact business. At most the evidence simply establishes a contrast between her mentality and that of Montgomery, arising from the lives they had lived respectively.

About March 15, 1940, Montgomery told a lady who conducted a business in the same office with him that Bell was coming in to make a deed in his favor to this land and told her generally what the deed should contain. Bell came in that day, discussed the matter with this lady, the deed was drawn by the lady, who thereupon read it to Bell and discussed it with her. Bell executed the deed and acknowledged it before this lady, she being a notary public. The whereabouts of the deed from then on is not shown, until the date it was sent, in an envelope containing Bell's return address, accompanied by Bell's check, for recording with directions to return it to Bell. The letter of transmittal was typed on the same machine that typed the deed, but the lady who owned the ma-

chine did not recall typing the letter. Where the deed remained after being returned to Bell is not shown.

The rule governing the issue thus presented to us has been stated by us in more than one decision. In Owens v. Musselman, 190 Okla. 199, 121 P. 2d 998, we said that fraud and undue influence usually are not presumed and ordinarily must be proved by clear, cogent and convincing evidence, but (1) where a confidential relationship is shown to exist between the grantor and grantee named in a deed, (2) where the deed is given for an inadequate consideration, and (3) some degree of physical or mental impairment on the part of the grantor raising a doubt of capacity to transact business is shown, the burden is then cast on the grantee to go forward with the burden of proof to show the complete good faith of the transaction and to show there was no fraud or undue influence used to obtain the deed.

In Antle v. Hartman, 193 Okla. 524, 145 P. 2d 756, this court held:

"Undue influence to vitiate a conveyance must destroy the grantor's free agency at the time the conveyance is executed and must in effect substitute the will of another for that of the grantor."

These decisions are cited for the statement of the rule that has been applied in those cases and others to show upon what basis of law plaintiffs rested their case and to serve as a background for the weighing of the evidence.

In those cases and many others cited, the fact situations differ so widely from the facts of this case as to render them of no use beyond merely repeating the rule. For instance, in many of these cases the act of the grantor is deemed unnatural because it has the effect of disinheriting children or grandchildren, when no such fact exists here. Brothers and sisters were disinherited in this instance by the conveyance of the property, but the facts regarding their relations with each other over a period of more than 40 years go far toward negativing the idea of a natural desire to pass the estate on to them. These parties saw each other at such rare intervals and corresponded almost as rarely so that the fraternal bond was of less influence than in the average case. Many of the cases cited involve conveyances made in the last days or hours of life, or conveyances made earlier but suppressed or secreted until after death and then produced to confound the close heirs. Neither such factor is present here. This deed was preceded by close relations between these parties, almost filial in aspect, by repeated statements of intent to give grantee all of grantor's property, publicity by the recording of the deed before death; all of which incidents deprive this transaction of any suspicion based on secrecy or hurried acts on the verge of death.

Zwirtz v. Dorl, 123 Okla. 284, 253 P. 75, is a case presenting the several factors just discussed. It is said therein that up to the day of the death of the grantor there was no basis for supposing that the grantor should deed the grantee her sole property to the exclusion of an only child, to say nothing of a daughter long unheard from. Yet the concluding portions of the opinion demonstrate that the rule relied on by plaintiffs was applied with reluctance and then only because of an accumulation of dubious circumstances that bolstered an otherwise weak case.

In the Zwirtz Case and others is mentioned the factor of the absence of "proper, independent advice" to the grantor. This is a thing that plaintiffs press here with vigor. When the fact situations about which this phrase is uttered are analyzed, it will be seen that actually it means, and should mean, only the absence of an opportunity to have independent advice. It really grows out of the undue influence with which one surrounds another that precludes the latter from having an opportunity to consult with someone else. For instance, in Flowers v. Flowers, 94 Okla. 134, 221 P. 483, the phrase is: "did not have the advantage of the advice of a third and disinterested party." Therefore, it must

be apparent that where the acts of the grantor, the period of time involved and the statements made before and after the deed are consistent with the deed, the opportunity for consultation with a disinterested third party or for receiving advice from a proper independent source is present. It is to be observed that the rule does not go so far as to say that the grantor must make his act conform to the advice. If the rule did require that, any person who desired to make a deed under circumstances similar to this would be bound to do as he was advised and his ignoring proper independent advice would be seized upon as an evidence of lack of business capacity or an unsoundness of mind. The independence of an individual to act as he chooses with respect to the disposition of his property is too valuable to be restricted by any such rules. In this case Bell had ample opportunity for asking the advice of a proper independent source, and if she did or did not seek such advice, that was her business, or if she did seek it and not being satisfied with it acted contrariwise, that also was her business.

As before stated, the trial court was dubious regarding the effect of plaintiffs' evidence, and in conformity with the rule being discussed, required Montgomery to produce evidence. It is difficult to conceive a weaker case than that presented by plaintiffs, and when it is contrasted with the showing made by Montgomery, it is apparent why the rule has no application here. Although the burden was cast onto Montgomery, he was not permitted to testify because of the so-called "dead-man rule," 12 O. S. 1941 §. 384.

Several of plaintiffs' witnesses cast doubt upon the soundness of mind of Bell because of her forgetfulness; and yet, when these witnesses were asked to name dates and occasions, the state of their own recollection was so faulty or uncertain they confessed to a sense of guilt in trying to criticize Bell. The incidents they testified to related to her forgetting that she had collected rents from them, a tendency to visit neighbors frequently and repeat stories already related, that she forgot she had a will and was undertaking to prepare another, one instance of hallucinations that she was hearing voices or seeing things, and her forgetting that her community had voted to abolish the sale of beer and her vain efforts to buy beer thereafter. Several of these were definitely fixed in the last two years of her life, after she had executed the deed. At least two of these witnesses who were giving testimony designed to destroy her capacity to execute a deed admitted they tried to purchase property from her; and at least one of them testified Bell declined to sell the property, saying it was hers during her lifetime and was Montgomery's thereafter. No witness for either party testified that there was any surprise that Bell gave this deed and the fact of her regard for Montgomery, her many statements of intention to benefit him, and his kindness and care for her would lead them to regard it as an unlooked for and unnatural act if she omitted to give him her property.

We are of the opinion that the element of a total failure of consideration or even an inadequate consideration is not present here. As stated, the grantor did not undertake to recite a consideration other than love and affection, Montgomery has not undertaken to show the payment of a separate consideration of value adequate to the purpose at the time of the execution of the deed, the plaintiffs have not undertaken to show that Montgomery was compensated for his services or that he abused his trustee relation to her by embezzling from her or compensating himself at her expense without her knowledge, and Montgomery has not asked in this case for an allowance for his services. Nevertheless, this record does not permit us to be oblivious to the nature, extent and value of the services he rendered her. He, being a person sui juris, was privileged to render them to her gratuitously if he so chose, but by the same token, she being a person presumably sui juris, and not actually found to be of unsound mind, she was privileged to give him her property without

consideration other than love and affection.

We think Montgomery sustained the burden that was on him and that the judgment is clearly against the weight of the evidence.

The judgment appealed from is reversed and the cause is remanded, with directions to enter judgment for Montgomery.

RILEY, WELCH, CORN, and GIBSON, JJ., concur. HURST, C.J., DAVISON, V.C.J., and ARNOLD, J., dissent.

