In the Matter of the ESTATE OF Clara Lee WEBB, Deceased.

Donnavin H. HIGGINS and Lila Farless, Appellants,

v.

OKLAHOMA NATIONAL BANK AND TRUST COMPANY OF CHICKASHA, OKLAHOMA, Special Administrator of the Estate of Clara Lee Webb, deceased, and Nadine L. Raffoul, Walter W. Webb, Jr., Steve F. Webb, Donna Jean White, Dana Jo Guy, Joe David Webb, Casey Webb, Jessica Webb, Gayla Baker, Gregg T. Ratcliff, and Larry Ratcliff, Contestants of Will, Appellees.

Nos. 76057, 77267.

Supreme Court of Oklahoma.

May 25, 1993.

Rehearing Denied Sept. 22, 1993.

Rex D. Brooks, Oklahoma City, for appellant Donnavin Higgins.

Karen L. Sacandy, Woodstock, GA, for appellant Lila Farless.

Tom Frailey, Huckaby, Fleming, Frailey, Chaffin & Darrah, Chickasha, for appellee Sp. Adm'r.

John M. Nelson, Park, Nelson, Caywood & Park, Chickasha, for appellees Contestants.

WATT, Justice.

### FACTS

The seeds of the dispute that caused these appeals were planted when Clara Webb's brother, Earnest "Pete" Webb, died at the age of 74 on May 27, 1988. Pete Webb, had worked as an accountant for Mobil Oil. He had never married, lived frugally, and left an estate of more than $700,000.00, most of it in cash and securities. Pete Webb was one of four brothers and a sister. None of Pete Webb's brothers were living at his death. Pete Webb's sister, Clara Webb, who was 90 when Pete Webb died, survived him. In his will, Pete Webb left his entire estate to Miss Webb. Miss Webb died on February 18, 1989. Most events relevant to this appeal took place between the time of Pete Webb's death and Miss Webb's.

Miss Webb never married; consequently her heirs at law were all collateral heirs. Miss Webb's heirs, the contestants here, were the child, grand-children, and great-grand-children of Miss Webb's brother, Wallace Webb, who died in 1939.

Miss Webb had taught school in Cement until her retirement in about 1964. After her retirement, Miss Webb moved back to Amber and kept house for her father and two of her brothers, all of whom predeceased Pete Webb. Miss Webb had lived

alone for several years before Pete Webb's death. Her house was on land, near Amber, Oklahoma, which her mother and father had bought in 1909. Miss Webb kept her own house, did her own banking, and shopped for her clothes. She had never owned an automobile nor had she learned to drive, so she had always relied on others to furnish transportation. Miss Webb was hard of hearing but bought hearing aids in October 1988.

The Amber property contained 299 acres, 200 acres of which were the original homestead that Miss Webb's parents had bought in 1909. Miss Webb had a life estate in the property. Pete Webb and Miss Webb had each owned an undivided one-half of the remainder. Before Pete Webb's death, Miss Webb had no income other than her teacher's retirement pay and the income from farm crops.

Donnavin Higgins, who was 51 when Pete Webb died, had known Miss Webb since about 1983. Higgins and Miss Webb shared a love of music. During gatherings at Miss Webb's house, Miss Webb would play the piano, and Higgins the violin. Higgins had occasionally done work around Miss Webb's house for her. Miss Webb and Higgins had always been good friends, and following Pete Webb's death, developed an even closer relationship. Higgins ran errands, drove Miss Webb, did some work, and supervised other work, around Miss Webb's property. Higgins had been married for over thirty years and had three children. By 1988, however, he and his wife had divorced. Higgins had been a bulldozer operator, had done odd jobs, and other construction work. He had filed for bankruptcy in 1987.

After her brother Pete's death, Miss Webb started to give Higgins some money. Higgins would accept no salary, but Miss Webb gave him cash and spent other money for his benefit. In June 1988, Miss Webb bought a five year old Cadillac, which she put in both Higgins's and her names. Later Miss Webb gave her one-half interest in the car to Higgins, but continued to pay all expenses associated with the car. Higgins drove Miss Webb everywhere she needed to go. They took frequent trips together. They went to World of Animals, to Cement to visit some of Miss Webb's former students, who were by then in their fifties, to Oklahoma City, and to other places. Miss Webb gave Higgins a camera, which he and Miss Webb used on the trips they took together. The record shows the total purchase price and expenses of the car totaled a little over $12,000.00, and that Miss Webb gave to Higgins and spent for his benefit another $12,000.00. In late September 1988, Miss Webb conveyed 50 acres of land to Higgins.

Miss Webb's niece, Nadine Raffoul, lived in Houston, Texas. Ms. Raffoul was the daughter of the Webb brother, Wallace, who had died in 1939. She stood to inherit one-fourth of Miss Webb's property not disposed of by will. In mid October 1988, while she was in Oklahoma, Ms. Raffoul called on Miss Webb and asked her about the car and land Miss Webb had given Higgins.[1] Ms. Raffoul severely criticized Higgins, and advised Miss Webb to end her relationship with him but Miss Webb refused to respond to anything Ms. Raffoul said about Higgins. Ms. Raffoul soon understood that her Aunt Clara was not prepared to accept her advice about Higgins.

Ms. Raffoul admitted that it had been her intention when she met with Miss Webb to ask Miss Webb to agree to a conservatorship of her property. Ms. Raffoul also admitted that she did not like Higgins, because, she claimed, Higgins had made a statement to her, years earlier, which she had construed to be a sexual advance. Ms. Raffoul decided not to ask Miss Webb about the conservatorship because she knew "it wasn't going to work." Nevertheless, Ms. Raffoul hired a lawyer and, on November 14, 1988, filed an action seeking the involuntary appointment of a conservator. Ms. Raffoul also admitted

---

1. Ms. Raffoul did not explain how she knew about the car or the land, and Miss Webb was surprised that Ms. Raffoul did know.

that she knew Miss Webb was angry with her because Ms. Raffoul had tried to have a conservator appointed. Despite her anger over Ms. Raffoul's conduct, Miss Webb left Ms. Raffoul securities valued at more than $10,000.00.

Another of Miss Webb's relatives, her cousin Doris Early, testified that Miss Webb was bossy. Doris Early was asked about an occasion when she "and Pete jumped on to [Miss Webb] about Don[navin,]" and Miss Webb "turned around and walked out of the room." Doris Early explained that Miss Webb usually "just walked away" when "somebody tried to get her to do something she didn't want to do."

In November, after Ms. Raffoul filed her conservatorship action, Higgins drove Miss Webb to the Offices of George Miskovsky, Sr.'s law firm in Oklahoma City. Miss Webb retained the Miskovsky firm to defend her in the conservatorship proceeding. Miss Webb met with Mr. Miskovsky, while Higgins waited in the reception area. Mr. Miskovsky then prepared a will for Miss Webb, which she signed.

Several weeks later, on December 12, 1988, Higgins again took Miss Webb to Mr. Miskovsky's office, where she made some changes to her will.[2] Again, Miss Webb met with Mr. Miskovsky out of Higgins's presence to discuss her will. Miss Webb signed the will while she was in Mr. Miskovsky's office. It is the December 12 will that was submitted for probate. This will contains detailed specific bequests. Miss Webb made twenty-one carefully described specific bequests of securities and devises of real property to twenty-six different individuals and charities, including Oklahoma Memorial Hospital, and the M.D. Anderson Medical Center in Houston.[3] Two of these twenty-six gifts were to Higgins. Miss Webb left Higgins her house, forty acres of land surrounding it, and 4200 shares of Mobil Oil stock. The property left to Higgins comprised slightly over one-third of Miss Webb's $780,000.00 estate. Miss Webb named as executor Donald P. Ferguson, a Chickasha lawyer.

Miss Webb died of cancer. The record does not reflect that she, or anyone else, knew she was seriously ill until February 5, 1989 when she entered the hospital.

Contestants do not claim that Miss Webb was mentally incompetent. In any event, the record would not support such a claim. Contestants insist, however, that Miss Webb's free will was overborne by Higgins's and that the December 12 will was the result of undue influence exerted by Higgins.[4] We disagree.

## PROCEDURAL HISTORY

Attorney Ferguson filed Miss Webb's will for probate on February 22, 1989. On March 8, 1989, contestants filed an objection to the probate of the will, and a petition requesting the appointment of a special administrator. Over Ferguson's objection, the trial court appointed Appellee, Oklahoma National Bank & Trust Co., Chickasha, as Special Administrator. Ms. Raffoul and the Special Administrator obtained the trial court's permission to file additional actions against Higgins to set aside the conveyance of the 50 acres, the

---

**2.** The November will is not a part of the record, nor are any earlier wills that Miss Webb may have made.

**3.** When asked at trial if she thought Higgins had exerted undue influence on Miss Webb to make the bequests to the other beneficiaries, Ms. Raffoul testified,

A. I think somebody told Clara to think of all the people she could and write them down there and it would be that many more that we would have to contest. *It makes it look better for Higgins cause he wasn't taking the whole thing.* You want to know my opinion, that's it. [Emphasis added.]

**4.** The only expert testimony on the subject of Miss Webb's susceptibility to undue influence came from Miss Webb's treating physician who testified that Miss Webb might have been more susceptible to being influenced by someone else because she had cancer. However the record contains a letter the doctor wrote on March 30, 1989 in which he stated that he had been asked about Miss Webb's mental status on that date. In his letter, the doctor said that he had not known Miss Webb before February 5, 1989, but when he saw her on that date, "She was felt to be alert and oriented as to time, place and person."

gift of the car, and to recover the cash Miss Webb had given Higgins. All actions were consolidated for trial.

### The Settlement Agreement

On March 13, 1990, a written agreement was entered into by: (1) All contestants, (2) All beneficiaries, except Higgins and Appellant Farless, (3) attorney Ferguson, as Executor of Miss Webb's will, and (4) the Miskovsky firm.[5]

The will's residuary clause provided that the beneficiaries were to share equally in any residuary estate. The settling parties agreed to the assignment of all rights in the residuary estate to the contestants, Miss Webb's heirs at law. Each heir would take the same percentage of the residuary estate as he would have taken of the whole estate had Miss Webb died intestate.

Under Miss Webb's will, Doris Early was to receive securities described·as "MIT Series # 390." Miss Webb owned no securities so described; consequently the settling parties agreed that Doris Early would receive MIT Series 2nd Texas.

Ferguson, as the proposed personal representative under Miss Webb's will, agreed not to seek appointment as personal representative of Miss Webb's estate. Ferguson also agreed to dismiss an appeal of the Oklahoma County District Court's order appointing Nadine Raffoul as Pete Webb's personal representative. Ferguson relinquished any further claims he might have as the proposed personal representative. In return, the settling parties agreed that Ferguson was to be paid $1,000.00 for his services to Miss Webb's estate.

The Miskovsky law firm agreed to withdraw any claim it might have to represent Miss Webb's personal representative in return for a payment of $10,000.00 from the estate.

On June 18, 1990 the trial court entered an order directing the Special Administrator to pay $1,000.00 to Ferguson, and $10,000.00 to the Miskovsky firm. On August 10, 1990 the trial court entered a second order approving the settlement agreement "in all respects," and directing the Special Administrator to make the partial distributions called for under its terms. The second order approved distribution to Doris Early of MIT Series 2nd Texas, although that asset was not left to Early in Miss Webb's will.

### Appeal No. 76,057

Higgins appealed from the trial court's order approving the Settlement agreement. Higgins complains that the order was premature.

During the pendency of appeal No. 76,057 the trial court heard evidence on the undue influence issues on January 8 through 11, 1991. Following that hearing the trial court entered findings of fact and conclusions of law in which it refused to admit Miss Webb's will to probate, set aside the conveyance of the fifty acres, and the gift of the car to Higgins on the ground that Higgins had exerted undue influence over Miss Webb.

### Appeal No. 77,267

Higgins and Farless appealed the undue influence finding and we consolidated the appeals. Farless also claims that the orders approving the settlement agreement were erroneous.

The Court of Appeals, Division 3, affirmed in part and reversed in part. We granted certiorari on April 5, 1993.

### ISSUES

#### I.

Does the record support the trial court's findings that Miss Webb's transfers of real and personal property to Higgins, and Miss Webb's will were the result of Higgins's exertion of undue influence?

---

**5.** Apparently Farless did not join with the rest of the beneficiaries in making this agreement because she believed that Miss Webb favored Higgins of her own free will. Farless is a distant relative of Miss Webb's.

## II.

Did the trial court err in allowing the Special Administrator to make the distribution according to the terms of the settlement agreement among some of the parties?

We answer no to both questions.

## DISCUSSION

### I.

Contestants claim that Miss Webb's decisions to give Higgins the land and the car, and to leave him property under her will were the result of Higgins's undue influence. Thus, two sets of statutes cut across their claim. Conveyances, and gifts of personal property, obtained by undue influence may be set aside under the terms of 15 O.S.1991 § 61 and § 233.[6] Gifts by will obtained through undue influence may also be set aside under the terms of 84 O.S.1991 § 43.[7] We see no need to distinguish between Miss Webb's lifetime gifts to Higgins and the gifts she made to him in her will. We believe our analysis here applies equally to both categories.

■ The fact that Higgins may have had some influence on Miss Webb does not make her decision to give him property during her lifetime and to remember him in her will subject to attack. If Miss Webb decided to give her property to Higgins out of affection and gratitude, his influence was not wrongful. "Influence secured through acts of kindness is not wrongful, and therefore not undue." *Canfield v. Canfield,* 167 Okla. 590, 31 P.2d 152, 156 (1934).

■ "The word 'undue' when used to qualify 'influence' has the legal meaning of 'wrongful' so that 'undue influence' means a wrongful influence, but influence acquired through affection is not wrongful." *Id.,* 31 P.2d at 153. To be actionable, the influence of another "must destroy the grantor's free agency, ... in effect, substitute the will of another for that of the grantor." *Watkins v. Musselman,* 205 Okla. 514, 239 P.2d 418, 423 (1951).

We cannot know what Higgins's true motives were in befriending Miss Webb, and we are not called upon to inquire. "It is not the province of the courts to unravel all of the intricacies of human relationship." *Canfield,* Id., 31 P.2d at 157. Instead, our focus must be upon Miss Webb: Was she weak willed and, therefore, abnormally susceptible to being influenced by others? The answer is clearly no. Ms. Raffoul's testimony shows that Miss Webb flatly, although courteously, refused to take Ms. Raffoul's advice concerning Higgins. Miss Webb had been so firm in declining Ms. Raffoul's unsolicited advice that Ms. Raffoul could not bring herself to ask Miss Webb to agree to a conservatorship of her property. Doris Early also complained that Miss Webb would take neither her advice nor Pete Webb's to have nothing further to do with Higgins. We note in this regard that Pete Webb left his entire estate to Miss Webb, despite his apparent dislike of Higgins. Whether Miss Webb's refusal to take Ms. Raffoul's and Doris Early's advice was good judgment or bad, Miss Webb's actions showed no tendency to allow her will to be overborne by others.

---

**6.** 15 O.S.1991 § 61 defines undue influence in the following language:

> Undue influence consists:
> 1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him.
> 2. In taking an unfair advantage of another's weakness of mind; or,
> 3. In taking a grossly oppressive and unfair advantage of another's necessities or distress.

15 O.S.1981 § 233 authorizes rescission of a contract obtained through undue influence in the following language:

> A party to a contract may rescind the same in the following cases only:
> 1. If the consent of the party rescinding ... was ... obtained through ... undue influence.

**7.** 84 O.S.1991 § 43 provides:

> A will or part of a will procured to be made by ... undue influence, may be denied probate ...

Contestants make much of Miss Webb's increased expenditures in 1988 compared to her expenditures in 1985 through 1987. We find this fact irrelevant to the issues here. Her inheritance of her brother's estate instantly changed Miss Webb's economic status from pensioner to what most people would regard as a wealthy woman. Of $66,831 Miss Webb spent in 1988, nearly $20,000 went to pay for her brother's funeral expenses, to buy hearing aids for herself, and to the Miskovsky firm, who were defending her in Ms. Raffoul's conservatorship action. The $12,000 she spent on the five year old Cadillac, coupled with Higgins's loyalty to her, gave Miss Webb the kind of independence those who have always owned and driven cars take for granted. That she would spend $12,000 to achieve such freedom for the first time in her long life is not surprising.

■ There is nothing in the record to support an inference that Miss Webb's gifts to Higgins were unduly influenced by Higgins. Miss Webb's decision to give property to Higgins is not evidence that Miss Webb did not exercise her own free will in doing so. Miss Webb was an educated woman who had been a school teacher for decades before her retirement. She had never married, and had lived alone for many years. In short, Miss Webb was a woman accustomed to living her own life and making her own decisions. By contrast, Higgins was a man of little education, who had worked in unskilled and semiskilled jobs his entire life. Miss Webb was nearly old enough to be Higgins's grandmother. We fail to see anything Higgins did, or could have done, to convince Miss Webb to do anything that Miss Webb did not wish to do.

Our conclusion that Miss Webb's decision to give some of her property to Higgins was not the result of undue influence is buttressed by another factor. There was nothing unnatural about Miss Webb giving Higgins some of her property, although he was not a blood relative. Miss Webb had never married and, therefore, had no direct heirs. Her nearest relative, her niece Nadine Raffoul, lives in Houston, Texas. Nor does the record show a particularly close relationship between Miss Webb and any of the other contestants. Nevertheless, Miss Webb remembered many of them in her will.

Contestants rely on *Matter of the Estate of Beal,* 769 P.2d 150 (Okla.1989) to support their contention that the record supports the trial court's finding of undue influence. A review of the facts in *Beal* convinces us that contestants' faith in it is misplaced. In *Beal* the proponent of the will actively participated in its preparation. Further, there was evidence that the testator was weak minded. Here, the record is undisputed that Higgins did not participate in the making of Miss Webb's will. Miss Webb was far from weak minded, as shown by her resistance to Ms. Raffoul's aggressive campaign to deprive Miss Webb of discretion over the disposal of her property.

According to contestants, Higgins had a confidential relationship with Miss Webb. Assuming such a relationship existed, it avails contestants nothing because the undisputed proof shows that Miss Webb had an independent nature. In *In re Estate of Newkirk,* 456 P.2d 104, 108 (Okla.1969) the decedent's widow and daughter contested a provision in decedent's will, in which the testator left all his property to his long time paramour, whom he had held out to be his wife. Although the paramour had enjoyed a confidential relationship with the decedent, we held that its existence did not establish undue influence because "Uncontroverted evidence of testator's strong will and positive character effectively negated contestants' claim based upon such relationship."

In *In re Jones Estate,* 190 Okla. 123, 121 P.2d 574, 576 (1942) the testatrix left no direct heirs. We held there was nothing unnatural in the testatrix having decided to leave her estate to a non-relative. Although the non-relative beneficiary "had extended from time to time to the testatrix a little help and consideration under circumstances which were calculated to make the testatrix feel grateful therefor, ..." we said, "a will made in favor of a person under such circumstances cannot be held to

have been made as a result of undue influence." To the same effect see *Montgomery v. Willbanks*, 198 Okla. 684, 181 P.2d 240, 243 (1947).

Ms. Raffoul testified at trial that she "fully expected" the property to be left in the "family." Despite the contestants' expectations, the property at issue here was not "family" property, it was Clara Webb's property, hers to dispose of as she saw fit.

As this is a case of equitable cognizance we are free to overrule the trial court because of our conclusion that the evidence does not support the trial court's decision that Clara Webb was acting under undue influence.

The trial court erred in holding that Clara Webb's gifts to Higgins were the result of undue influence. We reverse and remand with instructions to the trial court to hold in favor of Higgins on contestants' claim that the conveyance of the fifty acres and the car to Higgins were the result of undue influence. We also reverse the trial court's decision refusing to admit Clara Webb's will to probate. We instruct the trial court to admit to probate the will of Clara Webb, and to give effect to its provisions, including the specific bequest and specific devise to Donnavin Higgins, and further including the specific bequest to Lila Farless.

## II.

Higgins appeals from the trial court's order approving the settlement agreement. Farless also contends that the trial court's order was erroneous. Both claim that the Special Administrator lacked power to make a partial distribution, even under a court order.

■ The portion of the trial court's order directing that MIT Series 2nd Texas securities be delivered to Doris Early in place of the non-existent MIT Series # 390 concerns us. We need not deal with this potential error in the trial court's order, however, because contestants admit that to have executed this part of the order before the will contest was resolved would have been premature. We agree. MIT Series 2nd Texas is part of the residuary estate and the Special Administrator must not use it as a substitute to satisfy a bequest of non-existent property.

■ Excepting the distribution of MIT Series 2nd Texas, the distributions agreed to in the settlement agreement and the trial court's order approving them were called for under the will that Higgins and Lila Farless have successfully urged should be admitted to probate. In its order approving the attorney fee awards to Ferguson and to the Miskovsky firm, the trial court said the payment of the fees,

... is ... without prejudice to Donnavin H. Higgins and Lila Farless['s right] to be heard on the question of the appropriateness of such fees at a later time.

Higgins and Farless have not shown that they have been prejudiced by the settlement agreement and the orders approving its provisions. We are, therefore, unable to grant relief under this proposition of error.

CERTIORARI PREVIOUSLY GRANTED; COURT OF APPEALS' OPINION VACATED; TRIAL COURT'S DECISION REVERSED AND REMANDED WITH INSTRUCTIONS TO HOLD FOR APPELLANTS.

All the Justices concur.