KING et al. v. GIBSON et al.

No. 34877.   Oct. 14, 1952.

*249 P. 2d 84.*

Goode & Goode, Shawnee, for plaintiffs in error.

McArthur & Orton and Busby, Harrell & Trice, Ada, for defendants in error.

GIBSON, J. In the briefs the parties have been designated proponents and contestants, and we shall so refer to them.

The decedent, W. T. King, suffered a stroke in July, 1946. Thereafter, he was paralyzed on his right side and had difficulty in his speech. On May 27, 1949, he executed a will, and he departed this life on December 23, 1949, at the age of about 78 years. He had been three times married and Alice King. his surviving widow, is the mother of Vernal King who is joined with the executor, F. L. Gibson, as defendant in error. Contestants are children of King by one or the other of his former marriages, except one, who is a grandchild.

Under the will King gave bequests of $100 to each of his sons and daughters, together with 1/8 of 60 acres of royalty, in Coal county; to his wife a child's share of 1/8 of all his property, and the rest and residue of his estate to his son Vernal King, reciting in the will that said son had been "very kind and faithful to me in my present condition."

The will was contested in the trial court, and briefs are submitted here on the following contentions: (1) That decedent lacked testamentary capacity at the time the will was executed; (2) that the will was not (a) executed, (b) published or (c) attested as required by law; and (3) that under the facts developed a presumption arose that the will was procured through the exercise of undue influence by Vernal King.

The testimony as to decedent's mental incapacity to make a will, at the time it was made, is conflicting. Contestants place great reliance on the testimony of the physician who attended decedent at the hospital in Ada where he was confined for about two weeks in July and August, 1946, following his stroke.

The physician testified that decedent suffered from cerebral apoplexy or a

stroke; aphasia or loss of ability to talk; and arterial sclorosis or hardening of the arteries. He stated that decedent was paralyzed on his right side; that arterial sclorosis is progressive in character, at varying rates in different individuals, and that it can cause softening of the brain tissues. He further testified that when Mr. King left the hospital he could not talk and that one cannot make a very good estimate of a man's mental capacity when the patient cannot talk. He further testified that he did not see decedent after he was discharged from the hospital and he could not say what his mental capacity would be at a later date unless he could see and examine the patient.

Lay witnesses expressed opinions, pro and con, as to decedent's mental capacity to make a will in May, 1949. Some witnesses could understand Mr. King when he talked and some could not. There was testimony that he acted like a child; that he would break down and cry; that he forgot the names of his friends and even of his children; and that he was illiterate and could not have understood the legal phraseology of the will when read to him. There was also testimony that he rented rooms in houses that he owned in Stonewall, Oklahoma; and that he made the terms, and collected the rents; that he knew the dates when rents were due. In the three years following his stroke decedent conducted a number of business deals. In October, 1946, he puchased certain lots in Stonewall. In June, 1947, he purchased other lots which he sold in August, 1948. In December, 1947, he purchased other real estate in Stonewall. Where he purchased real property the grantees named were himself and wife, as joint tenants with the right of survivorship. He sold his cattle in 1946 and some hay from his hay meadow of 110 acres. In these business transactions it was Mr. King who fixed the price terms. Those who dealt with him accepted his price or there was no deal. His wife or one of his sons were present on each occasion, but no one testifies that he was over-reached in any of his business transactions.

In 1947 he went to an attorney, who later became district judge, and had a will drawn. He took it with him and later advised the attorney that he wanted a change made and gave his reasons for the change. This will was never executed. The attorney testified that he got his information for preparation of will from decedent and could understand what decedent said although it was difficult to do so at times.

In May, 1949, decedent went to Judge G. T. Ralls, a venerable member of the bar for 50 years, and the presently involved will was drawn. Judge Ralls could understand what decedent said and got his information as to his property and heirs from decedent. The prepared will was read to Mr. King and he was satisfied with it. King had never learned to read or write. Judge Ralls inquired of him in the presence of the witnesses if he wanted Mr. Hudson to sign his name and King nodded his assent. Hudson wrote King's name and King signed by mark. There is testimony that the witnesses attested the will at his request and in his presence and in the presence of each other. There is testimony that he was rational and normal at that time and was not under coercion of any one. Vernal King was present but no witness testified that he took any part in the discussion of the will. Some time after its execution Mr. King personally gave the will to his banker, who is also executor, and asked that the banker keep it.

"Testamentary capacity is a question of fact to be determined from all the facts and circumstances in each case.

"* * *

"A person has testamentary capacity when his mind and memory are such that he knows, in a general way, the character and extent of his property, understands his relationship to the objects of his bounty and to those who ought to be in his mind on the occasion of making a will, and comprehends the nature and effect of the testamentary

act." In re Martin's Estate, 199 Okla. 567, 188 P. 2d 862.

"Evidence of a testator's ailing or weakened physical condition is not proof in itself of his testamentary incapacity; in order to constitute such proof, said condition must be shown to have rendered him incapable of understanding the nature and consequences of his acts at the time he made the will.

"* * *

"The judgment of the trial court on the issue of testamentary capacity in proceedings to contest a will, will not be disturbed unless it is against the clear weight of the evidence." In re Wheeling's Estate, 198 Okla. 81, 175 P. 2d 317.

See Dunkin v. Rice, 197 Okla. 150, 169 P. 2d 210.

We have read the entire record in this case and the finding of fact by the trial court that decedent was possessed of testamentary capacity at the time the will was executed is not against the clear weight of the evidence.

In support of their contention that the will was not executed as required by law, contestants cite 84 O. S. 1951 §55, and argue that proponents' evidence is not sufficient to show that decedent knew or understood the contents of the will.

"Strict compliance with the provisions of section 1546, O.S. 1931, 84 Okla. St. Ann. §55, need not be shown to establish the due execution of a will. Substantial compliance, if established by a preponderance of the evidence, is sufficient. In re Belmore's Estate, 189 Okla. 96, 113 P. 2d 817." In re Jones' Estate, 190 Okla. 123, 121 P. 2d 574.

Again we find the evidence conflicting as to whether decedent understood what he was doing in making the will, and we do not find that the trial court's judgment was against the clear weight of the evidence on that contention.

In support of their contention that the will was not published as required by law, contestants cite Hill v. Davis, 64 Okla. 253, 167 P. 465; In re Stover's Will, 104 Okla. 251, 231 P. 212, and McCarty v. Weatherly, 85 Okla. 123, 204 P. 632. In the case of In re Sawyer's Estate, 202 Okla. 21, 209 P. 2d 864, we were dealing with a case more nearly similar in its facts to the instant case than any of the above cases. Therein we distinguished the three cases cited by contestants and we cited other cases more in point with the case before us. Included in our citations was Speaks v. Speaks, 98 Okla. 57, 224 P. 533, which case more nearly parallels the facts in the instant case than any other cited in the briefs. Therein we had to deal with a will of a man made when he could not talk because of a throat affliction; who was ill when the will was made; whose assent to the terms of the will when read was indicated by a nod of his head, with doctors in disagreement as to his mental capacity; and where decedent did not expressly request the witnesses to attest the will.

This court upheld the probate of the will and in the opinion answers many of the contestants' contentions as to the execution, publication and attestation of the will involved in the instant case. Therein we said that the findings of the trial court in such an action as a will contest should be strongly persuasive and should not be set aside unless this court can say, in equity and good conscience, that the conclusion reached by the trial court is clearly against the weight of the evidence. This we cannot say from the record in the instant case. See In re Free's Estate, 181 Okla. 564, 75 P. 2d 476; In re Belmore's Estate, 189 Okla. 86, 113 P. 2d 817.

We now come to the argument that under the facts of this case a presumption arose that the will was procured by the exercise of undue influence on his father by Vernal King. We cannot agree with this contention. There is no direct evidence in this record of the exercise of undue influence by the son. From the time of the father's stroke in 1946 until his death he was unable to walk and was confined to his wheel chair.

Vernal King, a minister of the gospel, living in close proximity to his father, took care of his wants; traveled about with him and assisted him in his physical handicap and distress. Four of the contestants were nonresidents of Oklahoma, and only the wife and the youngest son Vernal were at home to care for decedent. The widow is not contesting the will.

When his father sold his hay and cattle and lands there is no evidence that Vernal interfered with his father's wishes or counseled against his father's business decisions. Judge Ralls testified that Vernal took no part in the preparation and drafting of the will. No witnesses testified that Vernal even spoke out at the time the will was executed. The will recites that the son had been very kind and faithful in his father's affliction.

This court has held that influence secured by acts of kindness towards a deceased person in his lifetime is not an "undue" influence. Canfield v. Canfield, 167 Okla. 590, 31 P. 2d 152.

The rule governing the exercise of undue influence has been announced by us as follows:

"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time the instrument is made and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced in the ordinary affairs of life or that he was surrounded by relatives and friends in confidential relationship with him at the time of its execution. Suspicion, conjecture, possibility, or guess that undue influence or fraud has induced a will, is not alone sufficient to defeat the probate of a will. Power, motive, and opportunity to exercise undue influence do not alone authorize the inference that such influence has in fact been exercised. Canfield v. Canfield, 167 Okla. 590, 31 P. 2d 152." In re Jones' Estate, 190 Okla. 123, 121 P. 2d 574.

See, also, Shamblin v. Shamblin, 206 Okla. 133, 241 P. 2d 941.

Whatever the influence which might have been exercised upon his father by Vernal King, it is not shown by this record to have been an "undue" influence within the above definition.

Affirmed.

HALLEY, V.C.J., and WELCH, CORN, JOHNSON, and BINGAMAN, JJ., concur.