**Rachel WALKER, Plaintiff in Error,**

**v.**

**Virgie M. RISK, Anna B. Gray, Grace L. Farlow, Myrtle Copeland, Fred Williams and Kennie Williams, Defendants in Error.**

**No. 39948.**

Supreme Court of Oklahoma.

March 19, 1963.

Tony Jack Lyons and James A. Worrell, Pryor, for plaintiff in error.

Ernest R. Brown, Pryor, and Brainard & Carle, Claremore, for defendants in error.

BERRY, Justice.

On April 16, 1960, Mrs. Anna Hillis, hereafter referred to as "testatrix", died testate in Mayes County, Oklahoma. Testatrix was born in March, 1872. Her husband, who had been a practicing physician in Mayes County, died in the early part of 1949.

The record shows that in August 24, 1949, testatrix executed a typewritten will in which she bequeathed the sum of $1,000.00 to the First Methodist Church of Pryor, Oklahoma, which bequest was to be used in part for creating a suitable memorial to testatrix's late husband, and the remainder of her estate to her half-sisters and half-brother or their issue. This will was apparently executed and witnessed in form and manner as provided by statute. On May 4, 1953, testatrix executed a codicil to this will in which she bequeathed certain personal effects to named nieces, some or all of whom had visited at her home in 1953.

On May 24, 1955, testatrix executed a holographic will which read as follows:

"last will and testament
I Anna Hillis being of sound
mind and memory.
revoke all other wills and
Codicles.
to my nurse Mrs. Rachel-
Walker
I will my home firniture and
the res residue of my estate
at my death.
Pryor Okla 24th day of May 1955
signed Mrs. Anna Hillis"

Subsequently, on May 25, 1957, testatrix executed a typewritten will in which she bequeathed $10.00 to each of her seven nieces and nephews and the remainder of her estate to Rachel Walker, hereafter referred to as "proponent". This will was executed and witnessed in form and manner as provided by statute.

Following testatrix's death, proponent offered the last above mentioned will for probate in the County Court of Mayes County. Defendants in error, hereafter referred to as "contestants", who are nieces and nephews of testatrix, filed a contest to the will. Following a hearing this contest was sustained and it was ordered that the will not be admitted to probate. From this order, proponent perfected an appeal to the District Court of Mayes County.

Thereafter, proponent offered the holographic will for probate in the mentioned county court. Contestants also filed a contest to this will. Following a hearing, the contest was denied and it was ordered that the will be admitted to probate. From the order, contestants appealed to the mentioned District Court.

It appears that the appeals were either consolidated or set for trial on the same date. It further appears that proponent abandoned her appeal and the trial in the District Court embraced only the issues presented by contestants' appeal, which issues apparently were these: (a) that the will was not that of testatrix; (b) that it was not a valid will; (c) that prior to alleged execution of the will testatrix had been adjudged mentally incompetent, a guardian was appointed, she has never been restored to competency and was not of sound mind nor capable of disposing of her property as of date of will; (d) that a confidential relationship existed between proponent and testatrix at time will was executed, and execution resulted from undue influence of proponent over testatrix; (e) that execution of will resulted from threats, menace and duress practiced by proponent upon testatrix; (f) that execution of will was obtained through fraud and deceit of proponent.

Following trial of the appeal to the court it was found that "(6) That there existed between the decedent-testatrix and the proponent, Rachel Walker, a confidential relationship of nurse-patient, and that there was no independent advice given to the decedent-testatrix concerning the execution of said holographic will; (7) That at the time of the making, execution and delivery of said holographic will the testatrix, Anna Hillis, was not seized or possessed of testamentary capacity; and, (8) That by reason of the lack of testamentary capacity said holographic will is not entitled to be admitted to probate, and the judgment and ruling of the County Court of Mayes County, State of Oklahoma, made and entered in probate Cause No. 4300, on the 9th day of December, 1960, should be reversed." The court specifically found that the will was executed by testatrix; that proponent did not exercise undue influence over testatrix and that execution of the will did not result from duress, fraud, etc. Judgment was entered in favor of contestants. From order denying proponent's motion for new trial, she perfected this appeal.

For reversal proponent contends that "The finding and adjudication by the trial court that the decedent, Anna Hillis, was not seized or possessed of testamentary capacity at the time of the making or executing the will in contest, was clearly against the weight of the evidence and contrary to law."

Contestants counter the contention so made by proponent and as an affirmative proposition urge that the evidence clearly shows that proponent abused the confidential relationship existing between her and testatrix by exercising undue influence over testatrix; that the latter's execution of the will resulted from such influence.

▆▆▆ On repeated occasions we have held that a person has testamentary capacity when his mind and memory are such that he knows, in a general way, (a) the charac-

ter and extent of his property; (b) understands his relationship to the objects of his bounty; (c) is cognizant of those who should be in his mind on occasion of making will, and (d) comprehends the nature and effect of the testamentary Act. See King et al. v. Gibson et al., 207 Okl. 251, 249 P.2d 84, and cited cases. We add, that it is pointed out in the last cited case that testamentary capacity is a question of fact to be determined from all the facts and circumstances in each case.

The parties agree that the mentioned tests are applicable in determining whether testatrix was possessed of testamentary capacity at the time she executed the 1955 will.

█ The evidence bearing upon the proposition of whether the findings and judgment of the trial court as to testamentary capacity are clearly against the weight of the evidence can be summarized thusly:

The approximate value of testatrix's estate as of date of death was $32,250.00. Her properties consisted of a residence ($10,000.00); cash and other intangibles ($20,000.00); household furnishings ($1,-900.00); jewelry ($250.00).

On April 1, 1954, an order was entered by the County Court of Mayes County finding that testatrix was "mentally incompetent to handle her business affairs and to look after her personal welfare" and for said reason a guardian (C. D. Mitchell) should be appointed of her person and estate. This order became final. Testatrix had not been restored to competency as of date of her death and Mr. Mitchell served as her guardian at all times following date of his appointment as such.

In 1950 testatrix called at Dr. C.'s office in Pryor. Dr. C. was a practicing medical doctor. He testified that at said time testatrix complained of "headaches and dizziness"; that a physical examination disclosed that testatrix was then suffering from high blood pressure, which condition responded to treatment; that he next saw testatrix as a patient in 1951; that a physical examination showed essentially that testatrix's complaint and physical disorder were the same as in 1950; that he next examined her in January, 1952; that testatrix's physical condition was then as on the prior occasions; that in March, 1953, testatrix again called at his office; that she then "had extreme dizziness, some irregularity of the heart", and it was thought that she had sustained a "small stroke"; that she was placed in a hospital where she remained approximately two weeks; that in December, 1953, testatrix was readmitted to the hospital; that she had sustained an injury and was unable to walk; that she remained in the hospital for over three months principally because there was no one at her home to care for her; that she had grown "weaker"; that because of her "weakness and somewhat confused state" he felt "she was in no condition, either physically or mentally, to be allowed to remain alone"; that testatrix was then "forgetful, she would forget what happened earlier in the day, perhaps, although she had a fairly accurate memory for events some years back"; that her condition in "known as senile deterioration" which is attributable to "decreased circulation in the brain, which in turn is caused by narrowing of the arteries"; that this condition was present in the winter of 1953 and in 1954; that among the drugs prescribed for testatrix was "demerol".

Dr. C. testified in substance that it would have been unnecessary for testatrix to have been hospitalized on either occasion if there had been a competent person to care for her at her home; that he in effect recommended proponent who was a practical nurse, to care for testatrix; that in February, 1955, testatrix "looked remarkably well".

The guardian (Mr. Mitchell) testified that he had engaged in the banking business at Pryor for some 50 years; that he had known testatrix for many years; that following death of testatrix's husband she sought his advice and that she transacted her banking business through him; that after being appointed guardian he saw her

about twice a week; that in the latter part of 1953 she was senile; that in 1953 and 1954 and 1955 she was unable to feed or otherwise care for herself and could not "carry on an intelligent conversation"; that he entered into a contract with proponent to care for testatrix at proponent's home; that testatrix's home was in such disrepair as not to be habitable; that proponent was paid $500.00 a month for her services; that in walking testatrix needed assistance; that testatrix was apprehensive that her resources would be exhausted; that he assured her that her fears were unfounded; that he didn't advise her the amount being paid proponent; that testatrix would not recognize him and on two occasions addressed him as "doctor"; that as of date of making will testatrix was not "competent to make a business decision" nor did she have sufficient mental capacity to know the nature of or extent and value of her property or the identity of her "family" or their relationship to her.

The records of the druggist who furnished medicine and drugs used by testatrix during 1953 to 1955 were introduced in evidence. These were: laxatives, thorazine and demerol. Proponent testified that all medicine and drugs purchased were given testatrix in accordance with the doctor's prescription.

Contestants called two psychiatrists as witnesses. To each a hypothetical question was propounded that embraced pertinent evidence bearing upon testatrix's physical and mental condition and which were intended to elicit an answer as to whether testatrix as of date of will knew (1) the natural objects of her bounty, (2) the nature and extent of her property, (3) the nature and effect of a will, and (4) whether she could then form a testamentary plan. These questions were answered in the negative. From the case history that was recited to them, each psychiatrist classified testatrix's mental condition as "senility" or "senile dementia".

Each psychiatrist also testified that demerol is a synthetic drug or narcotic; that if the amount of demerol shown by the druggist's records as having been supplied to proponent immediately prior to execution of will was in fact administered to testatrix it probably would have adversely affected testatrix's mental facilities and she possibly would not have the mental capacity contemplated by the test heretofore mentioned; that the record of demerol supplied testatrix indicated she had become addicted to the drug. This was borne out by proponent's testimony that testatrix insisted upon injections of the drug. They testified in substance that withholding narcotics from one addicted thereto by a person in a position to administer same would place the latter person in a position where he could exercise undue influence over the other.

Proponent testified in substance that: testatrix's physical condition rapidly improved after she began to care for her; within a short time after she left the hospital the last time she was able to walk unassisted and did so; was also able to feed and bathe herself; on occasions she made short trips in an automobile driven by proponent, watched "TV", read newspapers and other material, prepared shopping lists, wrote post cards, discussed current events, recognized and visited with those who came to the home, insisted upon her person being clean, her hair dressed, nails manicured and upon being otherwise well groomed. Further, that testatrix used cosmetics and wore a corsage. This testimony was corroborated by proponent's daughter, sister, sister-in-law, an employee of proponent, a registered nurse who had worked with proponent, a long-time neighbor and a florist, all of which witnesses had occasion to observe testatrix daily or on fairly frequent occasions from date testatrix was last discharged from hospital to date of execution of will in controversy.

The registered nurse who testified gave an affirmative answer to questions which incorporated the test heretofore mentioned and it was the concensus of other witnesses

that testatrix was mentally competent at time will was executed.

The only testimony that may be said to detract materially from that last above mentioned was that of proponent to the general effect that in hearing relating to the guardianship she had testified that "to some extent" there was something wrong with testatrix's mind during time she was last in the hospital; that after testatrix was moved to her home "she would holler real loud * * * Things like that made you know she wasn't thinking exactly straight because a woman of her education and what have you wouldn't have done that." Also proponent's testimony to effect that testatrix thought that Mr. M. was defrauding her of her property; that she disliked Mr. M. and threatened to telephone the police relative to Mr. M.'s refusal of testatrix's demand that she be removed to her former home.

The evidence shows that proponent, her sister, daughter and proponent's employee were present during or shortly after testatrix wrote and executed the will, which was delivered to and retained by proponent. There is no direct evidence that any one influenced testatrix in drafting or executing the will. The evidence does show that the guardian was never advised of the execution of the will nor of the last (1957) will which was not admitted to probate, which will was drafted by an attorney who lived and practiced in another county.

Proponent testified that she advised testatrix of the amount she was being paid to care for her and testatrix appeared to be satisfied. But she further testified that testatrix was reluctant to sign the contract which was approved by the County Court and served to fix the amount that proponent would be paid for her services.

On repeated occasions we have announced the rule that a will contest presents a case of equitable cognizance and that while we will weigh the evidence, the findings and judgment of the trial court will not be reversed unless clearly against the weight of the evidence. See Hartman et al. v. Perdue, Okla., 365 P.2d 163.

We have carefully reviewed the evidence in the instant case and after having done so, we are convinced that the finding and judgment of the trial court as to lack of testamentary capacity on testatrix's part as of date of execution of the holographic will is not clearly against the weight of the evidence.

For reasons stated, the judgment of the trial court is affirmed.