W.E.B. Riddle died, leaving a will.
Petition for probate of the will was filed by Moss Weaver in the county court of Washita county and a protest was filed by Mrs. M.A. Garner, sister of the deceased. After a hearing in the county court the will was admitted to probate, and one H.H. Lamm appointed administrator. An appeal was taken to the district court of said county, and, after a hearing, the district court found in favor of proponent and ordered the will admitted to probate, from which order this appeal was taken. H.H. Lamm will be hereinafter referred to as proponent and Mrs. M.A. Garner as contestant.
The record shows that the will in question was executed on May 11, 1925, and that the testator bequeathed all of his property to his wife, Judith C. Riddle, and after her death to the General Superannuate Endowment Fund of the Methodist Episcopal Church, South. The wife died a short time prior to the death of the testator. The contestant appears as next of kin of the testator, as there were no children surviving his death.
The contestant relies upon two grounds in her attack on said will: First, that one Moss Weaver, being an intimate friend of long standing of the deceased, exercised undue influence over the testator to the extent that the will was in fact the will of the said Weaver and not the will of the testator; and, second, that at the time of the execution of the will the said testator was mentally incompetent to make a will.
The record shows that the said Moss Weaver is a Methodist minister and had been an intimate friend of the deceased for 30 years; had been pastor of the church of which the testator was a member; had been presiding elder over the district in which testator lived. It is shown that the testator was a very devout member of the church and a man of strong religious tendencies.
During the latter part of 1919, or in 1920, the testator suffered a paralytic stroke, and from that time until his death, which occurred on July 25, 1928, he was in a weakened physicial condition. About the 1st of January, 1925, the testator and his wife moved to the home of Weaver, and lived in his home for about nine months, during which time the will in question was executed. There were two wills made, and at the time the first will was executed, the first will being dated a few months prior to the will admitted to probate in this proceeding, the said Moss Weaver accompanied Mr. and Mrs. Riddle to the office of the attorney who drew the will. His testimony is that he did not remain there, but went out to attend to some other business while the will was being prepared. On May 11, 1925, the testator returned to the attorney's office and expressed dissatisfaction with the terms of the original will and wanted it changed. We quote hereinafter the testimony of Robert Steele, the scrivener of the will, with reference to this transaction, as follows:
"Q. All right, at whose suggestion, now, did you do away with that first will you are talking about and write this one? A. W.E.B. Riddle came to my office with his wife and there was no one with him but *Page 250 
his wife. Just those two, and he said, 'I am not satisfied with this will, the way it is written,' and he said, 'I want it different, could I do that without Mr. Moss Weaver knowing about it?' and I said, 'Certainly, you are making the will and Mr. Moss Weaver has nothing to say about it,' and I says, — And he says, 'Well, I want to destroy that will and make one a little different.' So he went to the bank and brought it over and we wrote this will and made the changes that he asked me to make and then we destroyed that first will and drew this one, and then, in order to have witnesses, — there was no one else in the office and we went over to the bank and when we got there we found Mr. Frank Kliewer there and Mr. Frank Kliewer and I signed as witnesses to this will. Q. Mr. W.E.B Riddle came, — signed the will in your presence. A. Yes, sir: he signed the will in my presence, there in the bank and in Mr. Kliewer's presence. Q. Did he ask you to sign as witnesses to the will? A. Yes. He made the usual statement after I explained that it was necessary for him to do that. He said it was his will and he wanted us to sign as witnesses."
Cross-examination by Mr. Linville:
"Q. Mr. Steele, what, if you know, is the difference between this will and the one that you prematurely drew? A. Well, Mr. Weaver and Mr. Riddle discussed that matter somewhat in my presence when he wrote the first will and it seems that the Methodist Church is divided into different departments and Mr. Riddle desired to leave, to will the property to the General Finance Board of the Methodist Episcopal Church, South, which, I understand, covers the entire south or the jurisdiction of that church in the United States. The General Finance Board of the church, and that's the way he wanted to make it and Mr. Weaver thought he ought to make it to the Oklahoma Finance Board, and so they discussed the matter and so the first will read to the Oklahoma Finance Board or some words to that effect, — I don't remember the exact words now, but anyway it was to be, — the money was to go to the church in Oklahoma. That was the first one and this one goes to the Methodist Finance Board, the General Finance Board of the whole church. That is the way Mr. Riddle wanted it made. Q. Now, you say Mrs. Riddle was present? A. Yes, she was present. Q. Both times? A. Yes, sir. Q. Did she do any talking? A. Well, I don't remember what she said, but she expressed herself that that was satisfactory and she was to be made executor of the will. Q. Both wills? A. Yes, without bond, and as I understand it she could hear perfectly well and understood what we were doing. Q. Now, did I understand you to say that the beneficiary in the first will was the Western Conference in Oklahoma? A. Yes, the department that belongs in this state. Q. He knew that the General Board of Finance was administering that department? A. No, he wanted to leave it to the General Board of Finance. The department covered by those words covers the entire south. The Oklahoma jurisdiction, whatever it is, just covers this state."
We believe the above testimony is pertinent to the issue of undue influence, as it reveals that when the will now offered for probate was made, the said Weaver was not present and had no knowledge of the execution thereof, and the language of the testator at that time indicates that he was disposing of his property according to his own desire and intention rather than according to the will and direction of Weaver.
The testimony of Weaver in this regard is that testator and his wife had discussed with him some 15 years before testator's death the proposition of leaving their estate to the church, and sought his advice as to which department or board of the church organization they should direct the estate to go. He denied having approached testator on the subject, but admitted discussing the proposition on numerous occasions when testator approached him.
In the case of Peace v. Peace, 149 Okla. 123, 299 P. 451, it is said:
"Suspicion, conjecture, possibility, or guess that undue influence or fraud has induced a will is not alone sufficient to defeat the probate of a will.
"Power, motive, and opportunity to exercise undue influence do not alone authorize the inference that such influence has in fact been exercised.
"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced in the ordinary affairs of life, or that he was surrounded by relatives and friends in confidential relationship with him at the time of its execution."
We find no account of any fact or circumstance in the record which indicates that the said Weaver possessed or exercised such influence over the testator as would invalidate the will under the well-established rule of law governing such cases. It is worthy of note that the beneficiary is a charitable and benevolent enterprise, in which Weaver was only incidentally interested, and neither he, nor any individual in whom he was personally interested, benefited directly by the bequest in the will. *Page 251 
With reference to the mental status of testator at the time of the execution of the will, the following applicable rule is announced in the case of Peace v. Peace, supra:
"In determining the mental status of a testator, presumption of sanity must be indulged, and, where a will appears to be a rational act performed in a rational manner, such presumption and such apparently rational act amounts to evidence of testamentary capacity. The fact that a testator has been adjudged incompetent to manage his property and business affairs and that a guardian has theretofore been appointed, are no more than evidence of incompetency which may be overcome by other evidence that the testator was mentally competent at the time of the execution of the will."
While it might appear that it would be unnatural for a person to devise his property to a benevolent enterprise instead of to those related to him by ties of blood, yet we recognize the possibility of a state of affairs where such an act would be entirely rational on the part of the testator. The testator died in the home of the contestant, his sister; yet there is no evidence tending to show an intimate relationship between the parties at the time of the execution of the will in 1925. At that time he lived in Oklahoma; she lived in Tennessee. On the other hand, the religious nature of the testator and his devotion to his church for many years explain a desire on his part to dispose of his estate as provided in said will.
The definition of the term "testamentary capacity" has been announced many times by this court as follows:
"If a testator understands the nature and consequences of his acts and is free from duress, menace, fraud, and undue influence at the time of the making of a will, he has testamentary capacity." Peace v. Peace, supra; In re Lemaster's Estate, 148 Okla. 300, 298 P. 884; In re Estate of James,131 Okla. 142, 268 P. 296.
In the case of In re Blackfeather's Estate, 54 Okla. 1,153 P. 839, it is said:
"The presumption of sanity goes with every one, and the burden of proving unsoundness of mind in a will contest rests on the contestant."
See, also, In re Anderson's Estate, 142 Okla. 197, 286 P. 17; In re Elrod's Estate, 154 Okla. 84, 6 P.2d 676.
There is a diversity of opinion shown in the testimony of the several witnesses as to the mental capacity of the testator. A number of witnesses for the proponent testified that in their opinion testator was mentally competent to make a will, and that although he was physically infirm by reason of a paralytic stroke, he had sufficient mental capacity to transact ordinary business and thoroughly understood the nature and consequences of his acts in making his will. It is shown that on January 17, 1927, testator negotiated the sale of his farm, and according to the witnesses handled said transaction in a business-like way. It is further shown that a short time before he went to Tennessee to live with his sister, he was questioned in regard to the will by one Hugo Lamm, who testified as follows:
"Q. What was said about the will? A. Well, they came into the bank and Mr. Riddle wanted to know what papers we had in the bank that belonged to him and we went and got the papers, the notes, and they wanted to know how much money he had and I suppose he taken $50 or $100 with him and in looking over these papers I think Mr. Riddle said he had some more papers in the Cordell National Bank and that he had a will there and some War Savings Stamps — a thousand dollars in the Cordell National Bank, and one of the boys, I think it was Rufus, asked me if I couldn't get Mr. Riddle to go by the bank for them so he would have them if he wanted them and I talked to Mr. Riddle and asked him if he had a will there and he said he did and I asked him if he didn't want to go and get that will and these stamps and take them with him, that his sister was going to take care of him and she was entitled to it, and he said that he made that will with Aunt Judith and he wasn't going to change it as long as he lived."
The following statements and observations appear in the testimony of the witnesses for contestant: That testator's memory was bad: that he had the mind of a child; that he was not capable of taking care of his own business; that he would get the blues and break down and cry like a child; one witness testified that the wife of testator stated that they had made a will and she reckoned that they ought not to have done it; that he was overpersuaded by a preacher.
In considering all of the testimony adduced herein, we conclude that testator was a man of at least average mentality until after the paralytic stroke, which, together with old age, somewhat enfeebled his mind; that he did not have the full mental capacity of his earlier years, but, under all the evidence, interpreted in the light of many previous decisions of this court, there is no showing that testator lacked testamentary *Page 252 
capacity to the extent that he did not know or understand the nature and consequences of his acts at the time of executing the will. Such was the finding of the trial court, which is not against the clear weight of the evidence. In re Estate of James, 131 Okla. 142, 268 P. 296; In re Lemaster's Estate,148 Okla. 300, 298 P. 884.
Contestant also assigns as error the failure of the trial court to make special findings of fact, after a timely request therefor, according to the provisions of section 556, C. O. S. 1921 [374, O. S. 1931], citing as authority Strother v. Harjo,110 Okla. 43, 236 P. 24, which case cites with approval McAlpin v. Hixon, 45 Okla. 376, 145 P. 386, which holds that the above statute is mandatory. A failure to comply with its terms does not constitute reversible error, where an examination of the entire record reveals that substantial justice has been done. In this connection see Potts v. First State Bank of Talihina,51 Okla. 162, 151 P. 859; Grant v. Mathis, 96 Okla. 65,220 P. 331. In the instant case there were but two issues of fact, that of undue influence and want of testamentary capacity. Included in the journal entry of judgment are positive findings by the trial court upon both issues. The rule of McAlpin v. Hixon applies herein, and no substantial injustice is shown by the court's failure to comply with the request.
The judgment of the trial court is affirmed.
CULLISON, V. C. J., and ANDREWS, McNEILL, BAYLESS, and BUSBY, JJ., concur. RILEY, C. J., and SWINDALL and WELCH, JJ., absent.