DECISION
The plaintiffs in this case are the three adult children of the late Paul A. Filippi (hereinafter "Paul"), who were born to him and his first wife, Elizabeth A. Filippi. Peter Filippi (hereinafter "Peter") was born in 1938, Carolyn Filippi Cholewinski (hereinafter "Carolyn") in 1941, and Paula Consagra (hereinafter "Paula") in 1946. The defendant is the corporate trustee of an inter vivos trust created by Paul on November 13, 1989. The plaintiffs seek a judgment of this Court setting aside and invalidating an Amendment to that trust executed by Paul on May 7, 1992. They claim that Paul's execution of the Amendment was the result of the exercise of undue influence by Marion Filippi (hereinafter "Marion"), his third wife.
 THE BACKGROUND
Paul died on June 6, 1992. He had for many years, up to the time of his death at age 78, owned and operated Ballards Inn and Restaurant on Block Island (hereinafter "Ballards"). Title to the land and building which the business occupied was by the time of his death held by him in his name alone. The business, itself, was the property of Shoreham, Inc., a Rhode Island corporation, all the shares of which were always held by Paul alone during his lifetime. It can safely be said that Paul was Ballards. Also, there is no dispute that the business was very successful, probably as much due to Paul's congeniality as to this business acumen.
Ballards was a seasonal operation, usually running from around Memorial Day to Labor Day, or a week or so later, each year depending on the weather. Ballards was a typical family business, in that at one time or another all of the plaintiffs and other relatives of Paul's worked or helped in the business.
Paul and the plaintiffs' mother were divorced in 1968, after which he had a brief childless marriage to Carol Weiss from 1971 until their divorce in 1973. Marion and Paul met in 1968, while Marion was employed in a summer job at Champlin's Marina, another Block Island enterprise owned by Paul and his brother, Victor Filippi. At the time Marion was a student at Vassar College, from which she graduated with a Bachelor's degree in 1970. After a courtship between 1968 and 1973, Paul and Marion were married on May 1, 1973. Marion continued her education with a Master's degree from the University of Rhode Island in 1974 and a Master of Business Administration from Bryant College in May 1986.
Three boys were born to Paul and Marion: Paul in 1975, Steven in 1979, and the youngest, Blake, in 1980. The evidence is undisputed that Paul deeply loved these three boys.
Paula regularly worked at Ballards in each Summer season, until she married Louis Consagra, a member of the Armed Forces with whom she lived outside of Rhode Island. In the Summer of 1976, at Paul's request she resumed working at Ballards, eventually becoming Paul's second-in-command of the restaurant and inn. Except for an incident in 1980, which the Court concludes was resolved at the time, but which bore forebodings of future problems, until 1987 relations between Paula and Marion were cordially correct, if not friendly.
Although Carolyn was actively employed at Ballards during her younger days, after her marriage to Clyde Rizio in 1973, she does not appear to have been involved in the family business. As a certified nurse anesthetist, Carolyn did become involved in Paul's health care following his bout of cancer in 1978 and after recurrences of the disease in 1979 and 1984. Carolyn, too, maintained a civil relationship with Marion. During a critical period in 1986 and 1987, it appears that Carolyn was involved in divorce proceedings with her ex-husband. In 1987 she moved permanently to Florida. After that her contact with Paul appears to have been by frequent telephone conversations and an occasional exchange of visits, the last of which was for a single day during the Summer of 1991.
Of Paul's three older children Peter had the closest consistent personal relationship with their father, particularly after Paula and Carolyn were married and moved away from Rhode Island. He worked regularly every Summer at Champlin's Marina and at Ballards. He spent considerable time with his father on his father's farm in Lincoln. On Block Island he saw or spoke with Paul practically on a daily basis until the very day before Paul's death. While Peter may not always have been the apple of his father's eye, the evidence discloses a good father-son relationship. Like Carolyn, Peter, also, had a correct relationship with Marion. She testified on cross-examination that Peter never had harsh words with her. Peter, himself, testified that he respected Marion as his father's wife.
The circumstances which contributed meaningfully to the execution of the 1992 Amendment began in 1984. At that time Peter became able to buy what has been described as the Ocean View Property. The particular value of this property derived from the fact that it was one of the last, if not the last desirable commercially-zoned undeveloped real estate on the Island. In addition, Ballards, itself, encroached on a portion of the Ocean View Property.
The eventual purchase, sale and distribution of the proceeds of sale among the members of the Filippi family are the subject of other litigation tried before a jury in this Court simultaneously with this litigation. Eventually, the property was purchased by Paul. While the Ocean View Property was still being held in Paul's name, in June 1986, Ballards was severely damaged by fire. The plaintiffs agreed that Paul could sell the Ocean View Property and use the proceeds to rebuild Ballards. At about the same time Paul made the same kind of decision to liquidate and sell Champlin's Marina.
In the other litigation tried with this case the jury found that Paul had made a binding agreement with the plaintiffs in 1987 to divide the proceeds of any sale of the Ocean View Property into six equal shares, one for each of Paul's six children, instead of the four shares as they had originally agreed in 1985. The plaintiffs contend that the addition of the three younger children to the distribution of the proceeds of the sale or development of the Ocean View Property was the result of Marion's domination of Paul. According to their testimony Paul explained the addition of his three younger children to the distribution was something he had to do to placate Marion. Peter testified that their father told them, "That's how it had to be." Peter's reaction was that, "I can live with it." When he later learned that his father had subordinated his purchase money mortgage to a first lien-holder, he declared, "Let me take my sixth and let me out."
Carolyn testified that her father was embarrassed when he announced that the proceeds of the sale had to be divided six ways instead of four. She testified that Paul said he was being forced by Marion to provide a one-sixth share to each of his three younger children, but that he wished to keep harmony in his home. She, too, was surprised that he had taken back a mortgage behind the first mortgage. Paula testified simply that the increase of the shares to six was fine. Each plaintiff also testified that they all agreed to the widened distribution.
Based on the evidence in the combined trial, the question of the distribution of the proceeds of the sale gave rise to discussion, if not tension, between Paul and the plaintiffs during 1987, before the re-opening of Ballards in June for the Summer. Peter was most insistent about getting his share. Paul referred him to Ronald Nani, his personal accountant. According to Mr. Nani's accounting of the sale of the Ocean View Property, Peter's share was approximately $260,706. Paul paid him $200,000, as a partial distribution of his share and $50,000, as a finders fee. In the other litigation the executors of Paul's will contend that the payment of $200,000 was a gift pursuant to an unenforceable promise by Paul to make a gift to Peter and his sisters. The jury found otherwise; in its review of the evidence on the defendants' motion for a new trial this Court agreed with that finding. Paul promised to pay the balance at the end of the Summer, but, after the purchasers reneged on their mortgage obligation, he never did pay Peter, although Peter testified he questioned Paul periodically.
According to Carolyn, when she asked for her share, Paul put her off, promising her at first that she would be paid in October 1987, when he expected the purchasers to pay off his subordinated purchase money mortgage. When the mortgagors defaulted, he promised that, until he could pay her share, he would pay her interest on the amount he owed her, according to her testimony. She went on to testify that certain payments Paul made to her after 1987 were interest payments on her claim. Marion testified that these payments were gifts to help pay for the education of Carolyn's children. The jury accepted Carolyn's claim and rejected Marion's explanation; on the motion for a new trial this Court accepted the jury's conclusion as reasonable.
In the Spring of 1987, as the re-opening of Ballards approached, Paula grew concerned that she would not receive her share of the proceeds, which she had agreed could be invested in the re-building of Ballard's. She testified in effect that Marion had already interjected herself into the Ocean View Property affair, and that, if she did not have some security that she would receive her share, Marion might be able to persuade her father not to pay her.
In order to satisfy Paula, in June 1987, Paul had his attorney prepare an assignment of the purchase money note and mortgage, which he had taken from the purchasers of a major portion of the Ocean View Property. In that assignment Paula agreed that the security represented a value of $260,706, the same amount as Mr. Nani had already computed as the share of each of these plaintiffs. By this time Paula had become Paul's chief assistant in the management and operation of Ballards. She had become important to the continuing success of the business. Paul had become dependent on her to run the business efficiently. Her loss to the business would have been serious, even if she was not irreplaceable.
Paula had another concern about Marion. She felt that Paul had promised her one of the so-called Bosworth Cottages on Block Island, which had been acquired jointly by Paul and Marion in 1982 or 1983, but which Paul had attempted to devise to his three older children in his 1983 will. Before she began work in 1987 she requested that, in addition to securing his promise to pay her the share in the proceeds of the Ocean View Property deal, Paul give her the Bosworth Cottage, to which she believed she was entitled. When Marion learned about that request she discovered that Paul could not convey the cottages without her consent. Marion so advised Paula in a stormy confrontation on Block Island in early July 1987. Thereafter, Paula left Ballards never to return. The Court can safely conclude that no love has been lost between Marion and Paula since July 1987.
It is clear from the foregoing history that the events of the Spring and Summer of 1987 represented the source of a serious rupture in Paul's relation with his older children. Understandably, they attribute the breach to the influence of Marion. On the other hand, Marion equally understandably feels that the older children unfairly pressured Paul by making financial demands on him while he was trying to rebound from the destruction of Ballards and to restore his business to its former sound footing.
 PAUL'S ESTATE PLANS BEFORE 1987
Marion and Paul were married on May 1, 1973, but Paul did not execute any subsequent estate planning documents until December 17, 1979, when he executed a will and living trust (Plaintiffs' Exhibit 44), after he had placed the family real property in Lincoln in their joint names, and after he had survived his first bout of cancer. Under that plan Paul provided generally that his estate would be divided into six equal shares to be held in trust under various conditions. Marion was to have the benefit of a marital trust which would be part of the satisfaction of a marital deduction. Each of Paul's then five children would be the beneficiaries of family trusts. The living trust was amended on June 23, 1980 to provide for further offspring in anticipation of the child who turned out to be Blake, his youngest.
A revised trust was executed on January 5, 1981 (Plaintiffs' Exhibit 47) with the following changes: each of the plaintiffs was to receive a specific gift of $25,000, payable $5,000 per year without interest for five years, and the remainder of his estate would be divided into five parts: twenty-five (25%) percent to Marion as a marital trust, nine (9%) percent for the benefit of Peter for life, and twenty-two (22%) percent for the benefit of each of Paul's by now three younger children. There is no evidence that these changes were prompted by anything other than the birth of Blake, although the "spaghetti incident" in the Summer of 1980 cannot entirely be overlooked. On November 4, 1981 the will and trust were revised to change the appointment of executors from Rhode Island Hospital Trust National Bank to Peter, Paula and Marion and to add them as trustees of the respective trusts.
Once again, on February 12, 1982, Paul revised his trust (Plaintiffs' Exhibit 51) with the following changes in the disposition of his estate: This time Paul proposed to divide his estate into sevenths. Three-sevenths was to be held by the trustee in a marital trust for the benefit of Marion. One-seventh was to be held for the combined benefit of Paul's three younger children. Two-sevenths was to be held in a family trust for the benefit of Paula. The last one-seventh was to be held for the joint benefit of Peter and Carolyn. This trust contains the significant sub-paragraph 1.9 which expresses Paul's wish that Paula manage Ballards. It is apparent that any favor out of which Paula fell in 1981 had been more than fully restored by 1982.
He executed another will on March 11, 1983 (Plaintiffs' Exhibit 52), which provided for a much more elaborate distribution of Paul's estate than any of the earlier wills or trusts. First, he specifically devised each of the Bosworth Cottages on Block Island to a particular plaintiff, the one called Long View, for example, to Paula. Paul was apparently unaware that his title to these cottages would pass to Marion, irrespective of the provisions of his will. Perhaps this devise was meant to be a request to Marion in the event she survived him. He bequeathed a sum of money to Marion to complete the marital deduction then available under Rhode Island estate tax law. He also provided that certain real property in Lincoln and on Block Island be held in a special trust for Marion's life. It is not altogether clear whether this real property was held at the time in Paul and Marion's name jointly, or for that matter by entireties, or whether Paul understood the implications of the nature of his title. He created a marital trust to complete a marital deduction under the then applicable provisions of the internal Revenue Code. He also provided for a family trust for the rest of his residuary estate for the benefit of this three younger children. In paragraph TWENTIETH Paul expressly notes that his omission to provide for Paula, Carolyn and Peter is not due to lack of affection for them but rather expressed his belief that he had adequately provided for them during his lifetime. Of particular note is the fact that Paula was re-appointed co-trustees of the marital trust and the family trust, as well as successor co-guardian of Paul's minor children and co-executrix of the will. In the event that Ballards was to become an asset of the marital or family trusts, Paul directed the trustees to lease the inn to Paula for twenty years for an annual rental of $50,000 plus annual cost-of-living adjustments. Although Paula has testified that she was unaware of the 1983 plan until after this litigation had been commenced, that testimony is simply incredible. In 1983 she was a trusted family member and employee. The Court just can't accept that Paul would not take her into his confidence to reveal that she would be a trustee, guardian and executor of this will. In its independent review of the evidence on the defendants' motion for a new trial in the jury-trial case the Court found this provision to be most instructive as to Paul's state of mind regarding his promise to provide for Paula in his will.
And so matters stood from March 1983 until January 1987.
 THE 1987 "PLAN"
Following the fire at Ballards in June 1986 and the sale of the Ocean View property and Champlin's Marina during 1986, as well as the imminent reconstruction of Ballards during 1987, and in furtherance of his obligation to share the proceeds of the Ocean View sale with his older children, Paul made a remarkable change in his estate plan. He revoked his March 1983 will and executed a new will on January 12, 1987 (Plaintiffs' Exhibit 54), leaving his entire estate, except for the proceeds of the sale of the Ocean View property, to his wife, in utter disregard of the ultimate consequences under the estate and inheritance tax laws then applicable. He specifically bequeathed a one-sixth share of the proceeds of the sale of the Ocean View property to each of his adult children in order to keep his promise to them good, even if he were to die before he could pay them off. Never again was Marion or the three older of Paul's children to have so favorable a disposition. Henceforth, Marion would be the beneficiary of a marital trust, and the shares of each of the three plaintiff would never exceed $200,000, instead of at least $260,706, as computed by the accountant, Ronald Nani.
The 1987 estate plan (to the extent it deserves such a designation) is typical of what surely must be countless such arrangements that loving spouses make for each other, in this case with a recognition of an outstanding business obligation by the testator to the off-spring of an earlier union. Although each of the plaintiffs suggest that their respective share of the proceeds were reduced from one-quarter to one-sixth at the insistence of Marion, each of them acknowledges that they all agreed to that reduction. None of them claims that Marion unduly influenced Paul or any of them in adopting a more favorable disposition for Paul's younger children. It is clear that the 1987 will was an effort to satisfy the claims not of Marion but rather of the plaintiffs, themselves.
After July 1987 Marion made it abundantly clear to Paul that Block Island was not big enough for her and Paula. If Paula were to come to work at Ballards, Marion and the children would vacation elsewhere. Paul did not keep his desire to have Paula's assistance at Ballards a secret, but he was faithful to his obligation to cleave to his wife, and so, he honored her wishes. The plaintiffs argue that Paul's acquiescence to his wife's desires are an example of her power over him. It is equally arguable that this is an example of the kind of compromise which promotes marital harmony, which serves to preserve even the best of marriages. No one ever accused Paul of failing to recognize value when he saw it.
 THE 1989 ESTATE PLAN
It didn't take long for Paul and his faithful advisor, Ronald Nani, to become aware of the inadequacy of the 1987 will to deal with the tax consequences his estate could expect to encounter. Some time in 1988 Paul was referred by Mr. Nani to Paul Silver, Esquire, an expert in trust and estate law, to prepare an estate plan. Mr. Silver met with Paul and Marion at their home in Lincoln on October 6, 1988. After his initial consultation, there remained only two major unresolved problems. The first was how to divide a portion of the estate between the plaintiffs and Paul's three younger children. The second was how the real property was to be left. The first problem was left for further consideration. On the second Marion wanted to have control of the family real estate and not to be subject to a trust, as it had been under prior plans. Paul wanted to be assured that it would remain for the children of his marriage with Marion. A considerable period of time elapsed before Mr. Silver met again with Marion and Paul. At a second meeting in June 1989, Mr. Silver suggested that Paul leave his older children an amount equivalent to the exemption from the unified gift and estate tax. At that time, the amount was approximately $600,000, less any gifts in excess of the annual exclusion. On July 18, 1989, Mr. Silver forwarded draft wills and a trust to Paul and Marion on Block Island. On October 25, 1989, Mr. Silver sent Paul and Marion revised documents for their review. In order to preserve the real estate for his younger children, the parties were to execute a contract whereby neither could change their wills without the consent of the other.
On November 13, 1989 Paul and Marion executed the documents, which constituted their estate plan consisting of Paul's will (Plaintiffs' Exhibit 57), Paul's inter vivos trust agreement (Plaintiffs' Exhibit 58) and a contract between Paul and Marion to execute mutual wills and not to revise the estate plan without the written consent of each other (Plaintiffs' Exhibit 59). Of direct concern in this litigation are the provisions of Sections 4 and 8 of Paul's trust. Those provisions pertain to the establishment and administration of a Family Trust. The initial beneficiaries of the Family Trust were the plaintiffs. The initial principal of the trust was to be the maximum amount of Paul's estate which could pass free of federal estate tax, which at the time would have been approximately $600,000. The shares of Shoreham, Inc. (Ballards of Block Island) were not to be allocated to the Family Trust.
Soon after the execution of these documents Paul spent Thanksgiving in 1989 in Florida with Paula and Carolyn. The plaintiffs do not contend that the 1989 estate plan was the product of any undue influence on Marion's part. They do argue that Paul's condition at about that time did subject him to her dominating influence.
Peter testified that his father's physical condition had dropped off "dramatically." Although Peter testified to a deterioration in Paul's mental alertness during the last two or three year's of his life, it is not clear how much of that deterioration had occurred by November 1989. Carolyn characterized his physical condition from 1987 to 1991 as "not in good shape." She offered no testimony regarding Paul's state of mental alertness at that time, but she did testify that during his visits to Florida in 1988 and 1989 he claimed to have lost control of his home and family. According to her testimony he said that Marion was making threats to take the children away from him and to put him in a nursing home. Paula corroborated the testimony of the other plaintiffs that Paul's physical condition in late 1989 was not good. In her testimony regarding Paul's 1989 Thanksgiving visit to Florida she says that Paul claimed he was "a hostage in his own home." She also quoted Paul as asking if she would come and get him if Marion put him in a nursing home. It was during this visit that she and Paul decided to try to use her husband's availability to work at Ballards as a means to get her back to the Island.
Although Louis Consagra was called and testified as a rebuttal witness by the plaintiffs, he never corroborated any of Paula's or Carolyn's testimony about Paul's specific grievances against Marion. It is striking that no one in the world other than Paula and Carolyn ever knew about the threats Paul claimed that Marion made to him. It is hard to believe that a person as gregarious and garrulous as Paul would not have hinted to some one that he was unduly pressured by Marion to do anything against his will.
It is also noteworthy that, although Paul was confiding his most intimate family details to his daughters, he made no mention of his most recent estate plan, which included a fairly generous gift to them, especially Paula's children, nor was there any discussion of the balances due them on the Ocean View sale. The Court is satisfied that the plaintiffs have exaggerated Paul's condition and remarks during his 1989 visit for litigation advantage.
The plaintiffs argue that the joint contract entered into between Paul and Marion not to alter their wills is an example of Marion's domination of Paul's will. In fact, the mutual contracts were devised to satisfy Paul and not Marion. It was Paul who wanted to be assured that, if he left the family real estate to Marion, it would remain in the family, meaning, of course, the younger children. According to Paul Silver, whose credibility is beyond question, the contract resolved Paul's concern about leaving the real estate to Marion outright. The Court notes that under the 1987 will the real estate had been left outright to Marion with no provision that Marion could not change her will. The contract, so far from being an example of Marion's domination, is a paradigm of marital accommodation between spouses. Paul was no "hostage in his own home." He was an equal partner.
The Court concludes that the estate plan of 1989 was the product of Paul's free will. Paul exercised his free will in conjunction with a due recognition of Marion's wishes. They consulted together in the plan, just as untold millions of married people do regularly. Paul's state of health, physical and mental, rendered him no more subject to domination by his spouse than if he had been in perfect physical and mental condition.
The importance of Paul's state of mind at the time of the execution of the estate planning documents on November 13, 1989, is that he was then not only fully capable of exercising his own free will but that he actually did so. As a consequence, it becomes necessary to search the record for some credible evidence that circumstances changed between then and the execution of the amendment on May 7, 1992. The plaintiffs contend that Paul's ability to resist Marion's importuning had so diminished by then that she was able to substitute her will for his regarding the benefits he was to leave to the plaintiffs. They point to what they claim was a deterioration in his physical and mental health, but they point to no other reason for his loss of ability to maintain his own dispositive will between November 1989 and May 1992.
 THE 1992 TRUST AMENDMENT
The principal evidence offered by the plaintiffs to account for Paul's alleged loss of ability to exercise his own free will in 1992 comes entirely from their own biased testimony. Peter described his father during the last few years of his life as a mental wreck, unable to keep himself clean and shaven, wearing dirty clothes, going without underwear or socks, being unable to recognize his own son, referring to long dead friends as if they were still alive, in short, a likely candidate for nursing home care. Significantly, the plaintiffs were completely unable to find a single disinterested witness who knew the human wreck described by Peter. Peter did discuss business rationally with his father the night before he died. By the time Peter finished testifying the Court fully understood Paul's paternal disappointment.
Carolyn saw her father once in the Summer of 1991 for one day. She failed to notice the physical or mental break-down described by Peter. She spent part of that 1991 visit on Block Island and part at Paul and Marion's home in Lincoln. Apparently, everyone was friendly. Although she testified that they spoke over the phone regularly, she never saw he father again before he died. He did complain, she said, about growing more and more tired and becoming more lethargic, as she described it. She also testified that during a phone conversation shortly before he died he said that he did not want to go to Block Island, but preferred to stay on the farm. In fact, he did go to Ballards to begin a new season's operation. This court concludes that Carolyn's bitter resentment of Marion has colored her testimony such that it cannot be given substantial weight on the ultimate issues.
Paula never saw her father alive again after Thanksgiving 1989. They were in regular telephone conversation. She did recall two significant telephone calls in 1992. In one she testified that Paul told her that Marion wanted him to put Ballards in her control by putting all the corporate stock in her name. Paul was concerned that she could then throw him in the street, according to Paula. In fact, Paul never transferred control of Ballards to Marion, notwithstanding his purported inability to resist her will. The other conversation occurred, according to Paula, when she had called her brother on Block Island and her father got on the phone, sometime in late April or early May. She said he was crying. He said he was sick, that Marion would not let Paula come back, and that he didn't want to be there anymore. One can scarcely blame Paula for the agony she suffered when her father chose his wife over her. Her testimonial demeanor was laden with understandable bitterness against Marion. What she failed to recognize was the cost to her father of that bitterness. The credibility of her testimony as to Marion's influence over her father is burdened by her spite over her father's choice in that one instance.
The obviously disinterested, impartial and unbiased testimony of Paul's long-time intimate friend, Philip N. Brownstein, is entitled to great, if not dispositive, weight as to Paul's state of mind during the period just before the execution of the 1992 amendment. Mr. Brownstein testified that he and Paul discussed "everything" together. He described Paul as an "outstanding" business person, "very" strong-willed, to the end of his life. According to Mr. Brownstein, who saw Paul within a week or two of the end of Paul's life, Paul was not a person who could be pushed around by others. Instead, he was an assertive person, who had strong ideas on a lot of things till the end of his life. Reflecting on Paul's condition within a week or so of his death, Mr. Brownstein found him to be mentally "alert, quite competent, not much change from what I had seen in him over the years."
When asked specifically whether it was plausible to him that Marion could have succeeded in substituting her will for his in respect to his financial affairs, this disinterested witness responded, "Since he (Paul) knew what he wanted to do and was, in my opinion, a very strong person, it would be hard for me to see where he would do something that he didn't want to do and didn't believe that he should do."
Mr. Brownstein's testimony about Paul's character was corroborated by Paul's long-time friend and business advisor, Ronald Nani, who testified unequivocally that Paul never did anything he didn't want to do, nor did he do anything just because Marion wanted him to. In addition, Paul's brother, Victor, and his wife, Janice, both of whom knew Paul and Marion well, re-affirmed that Paul was a strong-minded man, who never did anything he didn't want to do. According to Victor, "He was his own boss!" Finally, among the disinterested witnesses was James Kelley, an entertainer for many years at Ballards, who came to be a friend as well as employee of Paul's, who knew Paul and Marion fairly well. He testified that Paul was not the kind of person who could be controlled and never observed Marion to exercise control over Paul.
The Court concludes that the plaintiffs' argument that Marion so dominated Paul at the time of the execution of the amendment that he could not exercise his will to oppose her wishes is not supported by the weight of the evidence. The evidence which supports that argument, even if it had been fully credible, is inconclusive at best. To the extent Paul deferred to Marion's wishes rather than his own, as in the return of Paula to employment at Ballards, there is no evidence that Paul was incapable of acting freely. He simply chose to act in what he saw to be his own best interests. Only the plaintiffs know anything about the threats Marion is supposed to have levied against Paul, none of which were ever carried out.
The only direct evidence regarding the execution of the amendment, itself, came from its drafter, Paul Silver, Marion, and, sub silentio, from Paul, himself. Attorney Silver testified that he received a telephone call from Paul some time in April 1992. Paul wanted to make a change in his trust. The effect of the change would be to reduce the amount to pass to the plaintiffs to $50,000 apiece. During his testimony the lawyer at first could not remember whether he had asked Paul why he wanted to make the change. Later, his memory refreshed from his deposition, he did recall making such an inquiry without any response from Paul. The amendment was executed at Lincoln together with an amendment to the mutual contract to make and maintain wills and trusts executed by both Paul and Marion, which contained Marion's consent to the amendment. Paul Silver, understandably, could not tell whether Paul was unduly influenced by Marion to make the change. Nevertheless, in his official capacity as a notary public, Paul Silver took Paul's acknowledgment that the trust amendment was Paul's free act and deed. It is unthinkable that Paul Silver's jurat is false. Paul did acknowledge that the amendment was his free act and deed under oath before a notary. In order to accept the plaintiffs' argument, we are asked to conclude that Paul was induced by Marion to swear falsely.
Marion testified that one morning Paul came down to breakfast at their Lincoln family home and expressed some concern with her being able to come up with the money to satisfy the gifts to the plaintiffs in the 1989 estate plan. According to her testimony, she suggested that he think it over before he made any change. Eventually he decided to make the change. She called Mr. Silver and handed the telephone to Paul, but she did overhear the conversation between Paul and Attorney Silver. Mr. Silver came to their home where the documents were executed. She denied any suggestion that she told Paul what to do. She did consent to the change.
There is not the slightest evidence that at the time of the execution of the amendment Paul was physically or mentally so infirm that he was dependent on Marion for his maintenance. In spite of his physical limitations he was fully able to carry on the management of his active business. He was far from a bed-ridden or immobilized dependent on the good-will of a care-taker to get along. There is utterly no evidence that Marion was able to over-ride his wishes unless he wanted to let her. The totality of Paul's estate plan, including the 1992 amendment cannot be regarded as unnatural. Paul's older children were already established in life. His wife of nineteen years and the mother of his three beloved younger children surely deserved his fullest consideration. Even the outright gift of his entire estate with no benefit to his children would not ordinarily have been regarded as unnatural. See, for example, Estate of Mowdy, 973 P.2d 345, 347-48 (Okla. Ct. App. 1999) (citing Canfield v. Canfield, 167 Okla. 590,31 P.2d 152). This Court is satisfied as well that the benefits for the plaintiffs in the amendment are entirely appropriate gifts to them under the circumstances as natural objects of his largesse.
 THE ADVISORY VERDICT
Obviously, the Court disagrees with the advisory verdict returned by the jury in this case. The jury did find that the 1992 amendment to the trust was the product of undue influence by Marion. The Court has reviewed and weighed the evidence independently of the verdict. It has drawn the inferences that it has found to be the more reasonable. If this matter were before the Court on a motion for a new trial after a verdict in a jury trial, the Court would find that the verdict failed to respond to the merits of the controversy and failed to do substantial justice. The Court would have granted a new trial. This is not a case where reasonable minds could differ as to the conclusions to be drawn from the evidence. This is a case where based on the weight of the credible evidence and the more reasonable inferences there is only a single conclusion on the merits.
This Court does not lightly disregard the verdict of the jury. The Court is satisfied that the jury went wrong because this case was consolidated and tried together with the contractual claims of these plaintiffs against Paul's estate. Reasonable minds could find that Paul had failed during his lifetime to have lived up to serious and binding promises he had made to the plaintiffs. The damages awarded by the jury on those claims were clearly punitive. The jurors may have been disturbed by Paul's conduct. Marion's testimony did not help her cause. Under cross-examination she was shown to have invented testimony. The jury was justified in rejecting her testimony as incredible. So, the advisory verdict may also have been a result of a reaction to Marion's failure to testify truthfully at all times.
This Court instructed the jury:
 It is not undue influence for Marion to have asked Paul to provide for her and their children upon his death, if he freely of his own will agreed with her request. It will be undue influence only if she overcame his will with her own, but not if he was influenced only by his affection and love for Marion and his three younger children.
The jury plainly did not follow this instruction. Its verdict does not deserve the deference it might otherwise be accorded by the Court.
 CONCLUSION
The Court is satisfied from the competent credible evidence, together with all the reasonable inferences therefrom, that the 1992 Amendment to the trust created by Paul in 1989 was not at all the product of undue influence by Marion.
Judgment will enter for the defendant denying and dismissing the plaintiffs' complaint with costs to the defendant.
The defendant will present a form of judgment for entry on reasonable notice to the plaintiffs.